STATE ex rel SHARPE, Petitioner, v. SMITH, Superintendent
of Banks, et al, (Bank of Gann Valley, Intervenor),
Defendants.

(234 N. W. 764.)

(File No. 6980. Opinion filed January 30, 1931.)

*Crawford & Crawford* and *Charles P. Warren,* all of Huron, *Paul M. Young,* of Mitchell, *M. Q. Sharpe,* Attorney General, and *R. F. Drewry,* Assistant Attorney General, for Petitioners.

*Herbert E. Hitchcock,* of Mitchell, *T. B. Thorson* and *O'Keeffe & Stephens,* both of Pierre, for Defendants.

*Roy E. Willy,* of Sioux Falls, and *Churchill & Benson,* of Huron, for Intervener.

CAMPBELL, J.  This case involves the determination of the present situation in this state with reference to the law relating to the guaranty of deposits in banks operated under the control and

supervision of the state of South Dakota. The nature of the present proceeding is an original application in this court for mandamus, as will be more fully stated hereinafter. Any intelligent consideration of the problems here presented necessarily requires, as all parties to this proceeding point out in their briefs, a consideration of the history of the Bank Guaranty Law in this state and of operations thereunder, and the present status of conditions pertaining to such law. It requires also some contemplation of the political, economic, and historical background whence the Bank Guaranty Law emerged. We will therefore attempt to deal somewhat with these matters before undertaking to state the exact issues involved in the present proceeding.

Perhaps the earliest movement in the United States for the guaranty of bank deposits, as pointed out in several of the briefs filed herein, was in the state of New York in 1829, when there was inaugurated the so-called "Safety Fund Banking System." In those days the principal form of circulating bank credit was not, as it is today, checks, drafts, etc., representative of a deposit credit, but consisted of bank notes. The object and intention of the New York law was to provide adequate security for circulating bank credit in the form of bank note issues. The law was sufficiently broad in its terms, however, to embrace within its guaranty provisions, not only the note issues of banks, but all debts of banks. Numerous bank failures occurred in New York as a result of the panic of 1837, and the debts of the failed banks (as contra-distinguished from their outstanding note issues) were so great that the safety fund system completely broke down and collapsed under the strain. Similar experiments were inaugurated at about the same time in Michigan and in Vermont, but none of these early experiments were successful or continued long in operation.

The movement which resulted in the enactment of the South Dakota law for the guaranty of bank deposits, however, is of comparatively recent origin. Perhaps no one has made a more careful, comprehensive, and sympathetic study of the bank guaranty movement than Professor Thomas Bruce Robb of the Department of Economics of the University of Missouri, later of the University of Nebraska. In his book "The Guaranty of Bank Deposits" (Boston, Houghton Mifflin Co., 1921) he says (page 20):

"The Safety-Fund Banking Law of 1829 was the first application of the bank-guaranty idea in this country. But, as already pointed out, deposit guaranty was not intended to be a part of the scheme and it was abandoned after the panic of 1837. This experiment seems to have been forgotten, and it is doubtful if it had any connection whatever with the revival of the idea in the West nearly a century later. There is record of a few scattered attempts of associated banks to insure mutually their deposits. In Georgia and Florida there is a group of about a hundred banks which has a Mutual Depositors' Guaranty Fund to protect deposits, but such attempts have attracted little attention. Bank-deposit guaranty as we know it today seems to have been associated with the Populist movement of the west-central states. In Nebraska during Populist days there was continual agitation, and at one session of the legislature a serious attempt was made to pass a bank-guaranty law. John W. Breidenthal, a Populist bank commissioner of Kansas, urged such a law in his Report of September 1, 1898. Governor Leedy, a Populist governor of Kansas, called a special session of the legislature, and the bill that was presented passed the State Senate and lacked only four votes of passing the House of Representatives.

"The cause of this early agitation is not far to seek. In the strongholds of Populism the days of the protracted depression of 1893 were especially trying times. One crop failure had followed another in rapid succession. Many of the assets of the banks were in the form of boom paper held over from the years 1886 and 1887. The serious crop failures soon squeezed the inflated values out of this paper with the result that almost every other bank found itself practically insolvent. The numerous bank failures of this period worked incalculable hardship, and the Populist bank-guaranty agitation was the reflection of this distress. In 1897 a turn for the better came. A series of bountiful crops, in conjunction with other favorable conditions, was a boon to that section of the country. By 1900 the whole country was well launched on the upward swing of a modest boom and the Populist movement and the bank-guaranty agitation went out together."

Again, in 2 Encyclopædia Social Sciences (MacMillan Co., New York, 1930), Mr. Robb epitomizes the general situation as follows:

"The guaranty system of protection was offered as a concrete plan during the epidemic of bank failures following the panic of 1893. At that time other types of bank protection were poorly developed; standards of banking supervision were rather low, and in a number of states banks were not required to maintain reserves. Deposit guaranty become one of the objectives of the Populist party and in the west central states serious attempts were made to enact guaranty laws. With the return of prosperity the idea was forgotten, but it was brought forward once more during the panic of 1907, when the proposal became so popular that in the following year it was incorporated as a plank in the platform of the Democratic party. It was opposed, however, by many bankers; those connected with well established banks were particularly antagonistic, claiming that it was unfair to make their institutions pay for the recklessness of small and new banks. Moreover, national banks, being excluded from these state guaranty schemes and fearing the competition of state banks, also objected.

"Oklahoma became a state three weeks after the panic of 1907 had set in and within the next month passed a bank guaranty law. Similar laws were enacted in Kansas (1909), Nebraska (1909), Texas (1909), South Dakota (1909), Mississippi (1914), Washington (1917), and North Dakota (1917). The laws, although differing greatly in detail, were similar in general outline. In most cases all deposits not otherwise secured were protected. A guaranty fund, totaling either a percentage of protected deposits or a stated amount ranging from a half million to five million dollars, was provided by assessing each bank a percentage of its average daily deposits. Provision was usually made for raising special assessments in emergencies. If the fund became depleted through losses interest bearing certificates based upon its credit were provided for in most states; these were to be liquidated in normal times by assessments. A state banking board, which included the state bank commissioner, was usually charged with collecting the fund and administering the law. One of its most important functions was the supervision of the closing of insolvent banks and the payment of depositors. When all the available assets of a bank that had failed were exhausted, the balance due to depositors was paid out of the guaranty fund. These guaranty systems were made compulsory except in Kansas and Washington.

In Texas the banks were given the choice of either using the usual state mutual insurance fund or furnishing a bond for the protection of depositors."

With this survey of the larger picture of which bank guaranty in South Dakota forms a part, we turn to the particular situation in this state.

The first law in South Dakota relating to the guaranty of bank deposits was chapter 299, Laws 1909, which was a scheme entirely vountary in nature so far as the banks were concerned. The act was not to be effective until such time as one hundred existing state banks, with an aggregate capital of at least $1,000,000 should establish their eligibility to membership in a voluntary guaranty associations, pay their membership ʹfees, premiums, etc., and take the necessary steps to form and inaugurate the association. This condition was never fulfilled. The association never came into being, and the law was never availed of. Public clamor for guaranty of bank deposits continued, however, and in 1915 there was enacted in this state our first real law for guaranty of bank deposits as article 3 (sections 1 to 28) of chapter 102, Laws 1915.

The guaranty fund law of 1915 became a part of the South Dakota Revised Code of 1919 (sections 9005 to 9031, inclusive)ʹ without any intervening change, excepting that by chapter 143, Laws 1917, sections 6, 16, and 26 of the original act, which became respectively sections 9010, 9020, and 9029, Rev. Code 1919, were amended so as to bring within the protection of the law (which in its original form was designed for the protection of "depositors" only) both depositors and holders of exchange in good faith.

The general scheme of the law may be summarized as follows: It provided for the establishment of a depositors' guaranty fund commission to consist of the public examiner (later the superintendent of banks) and three persons to be appointed by the Governor to hold office for a period of two years. The first appointments to membership on said commssion were to be made by the Governor without recommendation, the only requirement being that said appointees should not be officers or directors of any national bank. The act provided that vacancies and future appointments should be made from a list of twelve qualified persons submitted to the Governor in the following fashion: Each state bank was required to select one of its directors to represent it in the

matter, and it was provided that "such persons so selected shall constitute a state bankers association, and such association shall select an executive council of not less than nine nor more than fifteen members who shall, on or before the tenth day of January in each odd-numbered year, recommend to the governor the names of twelve persons having the qualifications prescribed in this chapter for members of such commission, from which to appoint members of such commission. * * * " Rev. Code 1919, § 9006.

The statute required the guaranty fund commission so created to hold at least four regular meetings each calendar year, and such others as might be deemed convenient or advisable, and made it the specific duty of such commission to pass upon the qualifications of each state bank "for admission under the depositors' guaranty fund." Sections 9008, 9009.

Then follow sections 9010 and 9011 (the latter having been slightly, but not materially, changed in phraseology by amendment by virtue of chapter 122, Laws 1919), which sections (as thus amended) are:

"For the purpose of providing a depositors' guaranty fund for the protection of depositors in banks and holders of exchange, every bank engaged in the business of banking under the laws of this state shall be subject to assessment, to be levied, kept, collected and applied as provided in this article."

"On the first day of January of each year every bank engaged in the business of banking in this state shall make and file with the depositors' guaranty fund commission a statement in writing, verified by oath of its president, vice president or cashier, showing its average daily deposits for the preceding twelve months; and on the first day of the month next succeeding the day fixed for the making and filing of such statement the depositors' guaranty fund commission shall levy assessments against the assets of each of said banks as follows: On the first day of February of each and every year one-fourth of one percent of the average daily deposits as shown by these statements required to be made and filed on the first day of January of each year until the total amount of money in the guaranty fund reaches one and one-half per cent of the average daily deposits. Due and legal notice of such assessment shall be deemed to have been given when such notice as shall be prepared by the secretary of the commission has been placed in an

envelope, securely sealed, postage prepaid, directed to each of such banks and deposited in the United States mail.

"Provided, that when the Depositors' Guaranty Fund reaches the total sum of one and one-half per cent of the average daily deposits, said assessment against the assets of said banks shall cease until such time as the Guaranty Fund is depleted below one per cent of the average daily deposits, when the necessary assessments may again be levied at one-fourth of one per cent per annum until said fund again reaches one and one-half per cent of the average daily deposits."

The act provided how payments were to be made and computed for new state banks which might thereafter commence business, and stated the extent of the guaranty by section 9013, Rev. Code 1919, as follows:

"No bank which has fully complied with all the provisions of this chapter shall be required to give any further security or bond for the purpose of being a depositary for any public funds, but public funds shall be secured in the same manner as private funds are secured; all deposits not otherwise secured shall be secured by the guaranty provided for in this article, but such guaranty shall not apply to a bank's obligations as 'indorser upon bills rediscounted, nor to bills payable, nor to money borrowed from its correspondents or others; and each guarantied bank shall certify under oath to the depositors' guaranty fund commission, at the date of each January statement, the amount of money it has on deposit not eligible to guaranty under the provisions of this article, and in assessing such bank such amount shall be deducted from its total deposits."

The law limited the rate of interest which banks might pay on deposits to 5 per cent per annum, except that the guaranty fund commission might specifically authorize a rate not to exceed $5\frac{1}{2}$ per cent. The assessments made upon the various banks, as hereinbefore stated, were not to be remitted to the guaranty fund commission, but were to be segregated in the individual banks assessed pursuant to section 9017, reading as follows:

"Whenever any bank shall receive notice of any assessment under this article, it shall set apart, keep and maintain the amount so levied against it, which amount shall constitute a Depositors' Guaranty Fund, payable to the depositors' guaranty fund commis-

sion on demand, for the uses and purposes provided for in this article."

And it was provided that a bank which failed to comply with that requirement should be subject to a penalty and liable to closing and liquidation, and further provided that, in case of the suspension or insolvency of any bank, the amount of money so standing to the credit of the depositors' guarany fund on its books should be a first lien on all its assets, " * * * except funds deposited in such institution by the superintendent of banks and belonging to the estate of any insolvent institution, which shall have preference over all other claims."   Section 9019.

The manner and method of payment from the guaranty fund to persons who might become entitled to such payment, and the right of subrogation to arise therefrom, was covered by sections 9020 and 9021, reading as follows:

"When any bank doing business under the provisions of this chapter suspends or becomes insolvent, the superintendent of banks shall forthwith proceed to determine the amount necessary to pay the unsecured depositors and holders of exchange in good faith, in full, and cause the same to be certified to the depositors' guaranty fund commission, which shall thereupon draw against the depositors' guaranty fund on deposit in the several banks in the amount thus certified, and the treasurer of such commission shall immediately transmit the amount to the superintendent of banks, to be applied in payment of the deposits and outstanding exchange due such depositors and holders of exchange in good faith; provided, that if there should not be sufficient funds in the depositors' guaranty fund to pay such claims, such commission shall issue a certificate of indebtedness, negotiable in form, against the depositors' guaranty fund and in favor of such bank, drawing interest at the rate of five per cent per annum, which certificate of indebtedness shall become due and payable on the first day of March next succeeding the date of issue thereof, and shall be paid out of the first money accruing to the depositor's guaranty fund.   Such drafts against the depositors' guaranty fund shall be prorated, as nearly as may be, among the several solvent banks wherein such fund is kept and maintained, in accordance with the amounts thereof held by such banks respectively.

"To the extent of the amount paid from the depositors' guaranty fund pursuant to the preceding section, the depositors' guaranty fund commission shall be subrogated to all the rights of the depositors thus paid in the assets of such bank, for the use and benefit of such guaranty fund, and such rights shall be enforced by the superintendent of banks accordingly; and all amounts so derived from such assets shall be deposited by such commission in the solvent banks, subject to the provisions of this article, in proportion to the assessments levied against each such bank."

The act specifically and affirmatively required every bank to advertise to the public its admission under the guaranty fund by the language of section 9024, reading as follows:

"Immediately after being passed upon favorably by the depositors' guaranty fund commission, the secretary shall notify each and every bank so admitted, by mailing a certificate to such bank showing such admission, the same to the signed by the chairman and attested by the secretary of the commission and bear the seal of the superintendent of banks. Such certificate shall be carefully preserved by the bank receiving the same, by being framed or otherwise properly protected, and shall at all times be displayed in a conspicuous position in the lobby of the bank."

It also provided for admission under the fund of national banks which might reorganize as state banks, and provided by section 9030 for the situation that might arise if any bank which had paid any assessment or assessments into the depositors' guaranty fund should liquidate or should desire to organize as a national bank and withdraw from the guaranty fund.

In addition to chapter 122, Laws 1919, amending section 9011, Rev. Code 1919, as previously stated, chapter 119, Laws 1919, amended section 9005 to increase the per diem of the commissioners from $5 to $7.50, and chapter 123, Laws 1919, amended section 9016, making a slight change with reference to the adjustment of payments to be made by new banks which might be opened and come under the fund. Chapter 32, Laws Sp. Sess. 1920, amended section 9014 so as to permit the commission in certain special cases to authorize the payment of a maximum rate of interest on deposits up to 6 per cent instead of 5½ as previously, the permissible maximum in the absence of special permission being retained at 5 per cent.

Section 9020, Rev. Code 1919 (section 16 of the original act), hereinbefore set out, was the section providing for payments from the guaranty fund to depositors and holders of exchange in insolvent banks. It will be observed that the provision was for cash payments to such depositors by drawing on the amounts in the guaranty fund (i. e., amounts standing to the credit of the guaranty fund in the various assessed banks), and, in the event there was not sufficient in the guaranty fund to permit this cash payment, a certificate of indebtedness, negotiable in form, drawing interest at the rate of 5 per cent., should be issued in favor of the insolvent bank, becoming due and payable on the 1st day of March after its issue, and to be paid out of the first money accruing to the depositors' guaranty fund. There was no provision for negotiating such certificate of indebtedness so as to raise money thereon, and no provision for issuing certificates of indebtedness direct to the depositors. By chapter 134, Laws 1921, section 9020 was amended so as to provide that, in the absence of sufficient cash in the guaranty fund to pay depositors, the certificate of indebtedness to be issued to the insolvent bank might draw interest at a rate not to exceed 7 per cent (instead of 5 as previously), and might be negotiated at not less than face value by the superintendent of banks, and the proceeds used for paying the depositors of the insolvent bank. This amending act also introduced into the law for the first time a provision that, in the absence of cash in the guaranty fund, instead of issuing and negotiating one certificate of indebtedness to the insolvent bank and paying depositors out of the proceeds, certificates of indebtedness might be issued directly to the individual depositors for the amounts of their approved claims against the fund drawing interest at 5 per cent. The material language of the amending act was as follows:

"* * * Provided, that if there should not be sufficient funds in the Depositors' Guaranty Fund to pay such claims, such Commission shall issue a certificate of indebtedness, negotiable in form, against the Depositors' Guaranty Fund, and in favor of such bank, drawing interest at the rate of not to exceed seven per cent per annum, which certificate of indebtedness shall become due and payable on the first day of March next succeeding the date of issue thereof and shall be paid out of the first money accruing to the Depositors' Guaranty Fund. Such certificates of indebtedness may

be sold or assigned at not less than their face value by the Superintendent of Banks and the proceeds used by him for the purpose of paying the deposits of such bank which are legitimate claims against the Depositors' Guaranty Fund. Such certificates may, however, in the discretion of the Guaranty Fund Commission, be issued payable to the depositors of such bank for the amounts of their approved claims, drawing interest at a rate of five per cent per annum."

No further changes were made in the law until the legislative session opening in January, 1925. We may therefore profitably at this point devote some attention to the history of the operation of the law during the period from its inception in 1915 to 1925 and to the general banking situation in this state during that same period. All relevant figures here, as well as elsewhere in this opinion, unless otherwise stated, are taken either from the uncontroverted allegations of pleadings in the pending proceeding or from the published biennial reports of the superintendent of banks of the state of South Dakota, and the published annual reports of the United States Comptroller of the Currency. When figures are given relating to deposits, the items embraced therein are: (1) All time deposits; (2) all demand deposits; (3) all amounts due banks; and (4) all certified checks and cashier's checks outstanding. Figures, unless otherwise stated, are given as of June of the respective years. In June, 1915, there were in operation in this state under the state laws 531 banks with aggregate deposits (to the nearest thousand) amounting to $57,557,000. From 1915 to 1919, after an appreciable falling off the first year, the number of banks in operation under the state law steadily increased, and throughout the period the deposits in said banks steadily increased, as shown by the following table:

#### State Banks and Deposits in South Dakota

| Year | No. of Banks | Total Deposits |
|------|-------------|----------------|
| 1915 | 531 | $ 57,557,000 |
| 1916 | 498 | 72,066,000 |
| 1917 | 506 | 97,980,000 |
| 1918 | 517 | 123,801,000 |
| 1919 | 529 | 172,015,000 |

This was an era of general prosperity, good prices, and rising values throughout the state, and it is to be noted that during the

same period the number of national banks in operation in this state and the deposits therein steadily increased in very similar proportions, as shown by the following table:

### National Banks and Deposits in South Dakota

| Year | No. of Banks | Total Deposits |
|------|-------------|----------------|
| 1915 | 111 | $42,519,000 |
| 1916 | 124 | 52,804,000 |
| 1917 | 126 | 63,971,000 |
| 1918 | 125 | 73,145,000 |
| 1919 | 126 | 95,366,000 |

During the year 1916 one state bank failed. Its deposit liability amounted only to $26,458. That amount was on hand in the guaranty fund, and was promptly paid to depositors of the failed bank and with equal promptness was shortly thereafter repaid to the guaranty fund by liquidation of assets of the failed bank.

There were no failures in 1917 or 1918, nor up to June of 1919.

The peak of deposits was practically attained by June of 1919, though the number of banks in both systems continued to increase. During the next twelve-month period to June, 1920, the number of state banks increased from 529 to 557, but the deposit increase was slight, from $172,015,000 to $173,500,000. In the national system during the same period the number of banks increased from 126 to 136, but there was a decrease in deposits from $95,366,000 to $90,385,000. During this period one state bank failed on November 12, 1919. The amount necessary to pay its depositors was on hand in the guaranty fund, and the payments were promptly made in the aggregate amount of $128,025. The period from June, 1920, to June, 1921, was marked by a further increase in the number of state banks from 557 to 566, a slight decrease in the number of national banks from 136 to 134, and a decrease in the deposits of both state and national banks; the deposit of state banks falling from $173,500,000 to $136,366,000, and those of national banks from $90,385,000 to $68,671,000. One bank failed during this period on July 7, 1920. The amount necessary to pay its depositors was $495,755, which was on hand in the guaranty fund and promptly paid. From June, 1921, to June, 1922, there

was a decrease in the number of banks, the national banks decreasing from 134 to 133, and the state banks from 566 to 562, but a slight increase of deposits in both systems, national bank deposits increasing from $68,671,000 to $72,480,000, and state bank deposits increasing from $136,366,000 to 146,316,000. During this year, however, and in spite of the increase of total deposits, there was an appreciable increase in the number of bank failures, of which there were seven in the period, the first being on October 26, 1921, and the seventh on June 27, 1922. The aggregate amount necessary to pay the depositors of these seven failed banks was $1,546,-519, which was available in the fund and was paid to depositors. The ensuing year from June, 1922, to June, 1923, was likewise marked by a slight decrease in the number of banks and a slight increase on deposits; the national banks decreasing from 133 to 131, and the state banks from 562 to 556. National bank deposits, however, increased from $72,480,000 to $76,236,000, and state bank deposits from $146,316,000 to $157,269,000. This year again was marked by more bank failures 9 in number. As to the first 6 of these 9 failures occurring between July 31, 1922, and March 16, 1923, there was money enough in the guaranty fund to pay their depositors; the aggregate amount required for that purpose being $819,991. As to the remaining 3 banks which failed during the period, the guaranty fund being exhausted, certificates of indebtedness against said fund were issued direct to the depositors of those banks.

The period ending in June, 1923, marks the point when the guaranty fund ceased to be able to pay cash to depositors of banks which failed, and the following facts concerning the fund and the operation of the law at this particular stage are important and worthy of notice for purposes of comparison with the situation as it later developed: On June 30, 1923, the Guaranty Fund Law had been in operation for eight years. It had collected payments from approximately 35 newly formed banks, and had levied assessments against bank deposits at a time when the volume of such deposits was greater than has ever been the case in this state, either before or since. During these eight years of operation of the fund 19 banks failed, being none in the first year, 1 in the second year, none in the third year, none in the fourth year, 1 in the fifth year, 1 in the sixth year, 7 in the seventh year, and 9 in

the eighth year. The accumulations of the guaranty fund over this period of eight years were sufficient to take care of the depositors of the first 16 of those banks which failed in the aggregate amount of $3,016,750. Of these 16 failures, only 3 occurred during the first six years of the operation of the fund. As to the last 3 of the 19 failures which occurred during the first eight years of the operation of the law, there was no money in the fund to pay depositors, and certificates of indebtedness were issued to them.

During the following year from June, 1923, to June, 1924, national banks decreased in number from 131 to 116. Their deposits decreased from $76,236,000 to $66,189,000. At the same time the number of state banks decreased from 556 to 437, and their deposits decreased from $157,269,000 to 111,523,000. Also 116 state banks failed, being in this one year approximately six times the number of failures that had occurred during the entire eight-year period of the previous operation of the fund. Thereby a guaranty fund law, which had demonstrated its inability to accumulate in eight years of successful operation in good times, with large volumes of deposits and increasing number of banks, sufficient cash to take care of the depositors in more than 16 out of 19 banks failing in such eight-year period, was faced in the twelve-month period thereafter with 116 additional failures. Adding the 3 failures in the first eight-year period where the fund had been unable to pay cash to the depositors, there were now 119 banks which had failed, to whose depositors the fund was unable to pay cash, and to whom certificates of indebtedness were issued or issuable.

During the next twelve-month period from June, 1924, to June, 1925, there was a decrease in the number of banks in the state system from 437 to 415, and in the national system from 116 to 111, but there was in both systems a slight increase of deposits, in the state system from $111,523,000 to $116,485,000, and in the national system from $66,189,000 to $73,017,000. During this period also there were additional failures of state banks to the total of 25, whereby the number of failed banks to whose depositors the guaranty fund was unable to make payment was increased to 144, and to those depositors certificates of indebtedness against the fund were likewise issued or issuable.

The foregoing indicates the situation that was presented for the consideration of the Legislature when they met in 1925. The Legislature thereupon passed chapter 99, Laws 1925, which specifically repealed the guaranty fund provisions of the Revised Code of 1919, created a body to be known as the "Depositors' Advisory Commission," and transferred to such depositors' advisory commission the fund previously known as the depositors' guaranty fund, with a mandate to "keep said fund intact for the purposes herein set forth." Section 5. The act provided that all banks operating under state law should pay an assessment of one-fourth of 1 per cent of average daily deposits for the previous year in February, 1925, and April, 1926, which should go into the fund previously known as the depositors' guaranty fund, which was by this act transferred to the custody of the depositors' advisory commission. As to the distribution of the fund, chapter 99, by section 10 thereof, provided as follows.

"When in the judgment of the members of the Depositors' Advisory Commission, the greater part of the assets of failed state banks have been collected, they shall cause to be distributed the fund herein created, to the depositors of failed state banks, whose claims remain unpaid, in proportion to the amount of their original claim; provided that no part of such funds shall be distributed to depositors of banks failing after January 1st, 1926."

Before the effective date of chapter 99, Laws 1925, the referendum was invoked by proper petition, and the law was rejected at the next general election, and hence never became operative.

At the same time the Legislature passed chapter 100, Laws 1925, which did not purport to affect any portion of the previously existing Guaranty Fund Law, excepting only the matter of distribution of funds and payment of certificates of indebtedness. This chapter provided that all outstanding and unpaid certificates of indebtedness against the guaranty fund issued pursuant to section 9020, Rev. Code 1919, and the amendment embraced in chapter 134, Laws 1921, and such certificates as subsequently should be issued thereunder, should be paid in the following manner:

First. The superintendent of banks was directed to pay upon the principal of such certificates, and indorse thereon upon their delivery to him for that purpose the amount of each dividend paid to the respective certificate holders out of the liquidation of assets

of the banks in connection with the insolvency of which the respective certificates were issued.

Second. At its regular meeting in April each year, the guaranty fund commission was directed to ascertain the number and unpaid principal amounts of certificates of indebtedness outstanding on the second Tuesday of April, and the amount of money available in the depositors' guaranty fund on said date, and thereupon to draw on the various banks, wherein said guaranty fund money was on deposit, for at least 90 per cent thereof, and transmit the same to the superintendent of banks, who should prorate and apply it in payment of the unpaid principal amounts of outstanding certificates, and indorse the payments upon such certificates.

Third, After the principal amounts of all outstanding certificates had thus been paid, either by indorsement of proceeds of liquidation or indorsement of pro rata cash payments, payments should be made on the interest due on said certificates in the same manner. An emergency clause attached to this law was held invalid by this court (State ex rel Driscoll v. Smith, 49 S. D. 106, 206 N. W. 233), and consequently the effective date of the law was July, 1925.

As a result of the referendum and defeat of chapter 99, Laws 1925, the Guaranty Law as previously existing continued in full force and effect, save only in so far as the method of making payment upon outstanding certificates may have been validly modified by the provisions of chapter 100, Laws 1925, a matter which will be hereinafter discussed.

For two years more the situation continued as before, with banks failing and a constant decrease in the amount of deposits and number of banks. In the two-year period from June, 1925, to June, 1927, the number of state banks decreased from 415 to 319, and the deposits therein from $116,485,000 to $73,895,000. The number of national banks decreased from 111 to 98, and the deposits therein from $73,017,000 to $60,993,000. During the same time there were 86 failures of state banks and insufficient money in the guaranty fund to pay depositors, thereby increasing the number of failed banks whose depositors held certificates of indebtedness against the guaranty fund from 144 to 230. The situation on June 30, 1927, may be summarized as follows: During its first eight years of operation, the guaranty fund had been able to

accumulate and pay to the creditors of the first 16 banks which failed the sum of $3,016,750. During the next four years, or, to be exact, during the period from March 16, 1923, to June 30, 1927, 230 additional banks had failed, and there were outstanding certificates of indebtedness against the guaranty fund issued to depositors of said 230 banks at various dates of issue and various March 1st maturities from 1924 to 1928 of the aggregate principal sum of $45,031,336, each of said certificates bearing interest at the rate of 5 per cent per annum from date of issue. Meantime, and during the same period (from March 16, 1923, to June 30, 1927) that these interest bearing certificates had been issuing to the aggregate of over $45,000,000, the fund, without making any cash disbursements, had been able to accumulate by assessments and from all other sources an aggregate amount of $981,970, of which $38,481 was in closed banks and unavailable.

This situation of June 30, 1927, was substantially the same as that which had faced the Legislature of 1927 a few months earlier. Also prior to the legislative session of 1927, this court had held in the case of First State Bank of Claremont v. Smith, 49 S. D. 518, 207 N. W. 467, that the constitutionality of the Guaranty Fund Law must be determined as of the time of its enactment, and that the law was not rendered unconstitutional by any subsequent change of actual conditions. This court had also held in the case of Citizens' State Bank of Garden City v. Smith, 50 S. D. 579, 210 N. W. 990, that a state bank could reorganize as a national bank upon payment to the guaranty fund of its full assessment at the rate of one-fourth of 1 per cent per annum upon average daily deposits for the entire period during which it operated as a state bank, and was not required, either upon nationalization or liquidation, to make any other or further provision for the payment of any portion of the outstanding certificates of indebtedness against the depositors' guaranty fund.

By chapter 54, Laws 1927, the Legislature undertook to revamp the entire Bank Guaranty Law, and, in effect, to abandon the previous guaranty scheme and substitute a different and entirely new one. For convenience we will hereafter in this opinion refer to the Bank Guaranty Law previously discussed and originating in 1915 as the old Guaranty Law and the fund derived by virtue of that law as the old guaranty fund, and we will refer to chapter 54,

Laws 1927, as the new Guaranty Law and the funds thereby established as the new or individual guaranty funds.

The machinery employed in chapter 54, Laws 1927, was the specific repeal of a number of the sections of the old Guaranty Law and the specific amendment of others. The purpose of levying assessments under the old Guaranty Law was stated by section 9010, Rev. Code 1919, to be the "providing a depositors' guaranty fund for the protection of depositors in banks and holders of exchange." By section 3 of the new law section 9010 was amended, and by such amendment the purpose of the assessments provided for in the new law was stated to be the "providing for the protection of depositors in banks and holders of exchange." Section 9011, Rev. Code 1919, relating to assessments for the old guaranty fund, was also amended by the new law (section 4). The same provision for the return by banks in January of each year showing the average daily deposits for the preceding twelve months was retained, as was likewise the provision for a levy on February 1st of each year of one-fourth of 1 per cent of such average daily deposits for the previous year. Under the new law, however, when an assessment was made, the assessed bank, instead of crediting the amount thereof upon its books to a guaranty fund, was required forthwith to pay the amount thereof, either in cash or approved securities, to the treasurer of the guaranty fund commission, who was in turn required to credit the amount so received to an individual guaranty fund for the specific bank for which it was received, and to deposit said cash or approved securities with the treasurer of the state of South Dakota, "subject to withdrawal from the State Treasury only upon the order of the depositors' guaranty fund commission."

It was further provided that such assessments of one-fourth of 1 per cent of average daily deposits should be continued as to each bank until, by the proceeds thereof and accruals, there had been built up for each assessed bank an individual guaranty fund represented by cash or approved securities in the custody of the state treasurer, equal in amount to the capital stock of such individual bank, and the law provided as to each individual bank that such " * * * entire fund shall be retained to secure and indemnify the creditors of such bank from which such guaranty fund shall be collected, against loss by the failure of the said bank. * * * " And further that in case such individual bank should be closed as

insolvent, or for any other reason should be liquidated, and its assets were insufficient to pay its obligations in full, " * * * then the amount in the guaranty fund for said bank, or so much thereof as shall be necessary, shall be withdrawn from the state treasury upon the order of the guaranty fund commission and applied to the payment of the creditors of said bank. * * * "

The new law also provided that, upon the creation of such individual guaranty funds for the respective banks by such assessments, " * * * the amount thereof, as the same accumulates from year to year, shall become and at all times remain, the property of the stockholders of said bank as the individual ownership of said stock shall be disclosed by the books of said bank; subject, however, to the uses provided by this Act." The legislative intent as indicated by the new law is clear. No attempt whatever was thereby made to interfere in any manner with any existing cash or other assets of the old guaranty fund, or to deal with the question of payment of outstanding certificates of indebtedness against the old guaranty fund. But it was very plainly intended to do away with the whole scheme of the old guaranty fund. Assessments for the old guaranty fund were entirely abandoned, and the only statute which had previously made any provision therefor was changed by amendment to provide for assessments for an utterly different scheme, to wit, a series of new and individual guaranty funds to be established by each bank for the protection of its own depositors and holders of exchange to be represented at all times by cash or approved securities deposited with the treasurer of the state of South Dakota, and to be built up ultimately in each case until equal in amount to the capital stock of the bank.

An effort was made to submit chapter 54, Laws 1927, to the referendum, but failed because of insufficient signatures upon the petition and grossly improper manipulations of the petitions before filing (O'Brien v. Pyle, 51 S. D. 385, 214 N. W. 623), and the law went into effect in July, 1927. Thereafter the guaranty fund commission followed the new law according to its terms, and did not longer act upon any portions of the old law specifically repealed or amended by the new act. No certificates of indebtedness against the old guaranty fund were issued to the depositors of banks which failed after July 1, 1927, statutory authority therefor previously existing under section 9020, Rev. Code 1919, as amended by chap-

ter 13, Laws 1921, having been entirely abrogated by the amendment contained in the new law (Laws 1927, c. 54, § 9). Neither were any assessments for the old guaranty fund levied by the commission in February, 1928, or February, 1929, or at any time after July, 1927; the statutory authority therefor formerly found in section 9011, Rev. Code 1919, having been entirely abrogated by the amendment of said section in the new law. Assessments were levied by the commission, however, in February, 1928, and February, 1929, against the individual banks and the amount thereof required to be deposited in cash or in approved securities with the state treasurer for the establishment of individual guaranty funds for the respective banks, as required by the new law. The total amount received into such individual guaranty funds as a result of the first two assessments under the new law, was $393,654.

Pursuant to the requirements of chapter 99, Laws 1925, outstanding certificates of indebtedness against the old guaranty fund were called in, and there was indorsed upon the principal thereof as the proceeds of dividends resulting from liquidation or partial liquidation of the banks in connection with the insolvency of which said certificates were respectively issued an aggregate amount of $8,665,817. No cash payments have been made upon any of said certificates of indebtedness excepting in one instance. The seventeenth bank which failed after the Guaranty Law went into effect, and the first bank to whose depositors certificates of indebtedness against the old guaranty fund were issued, was the Stockgrowers' Bank of Ft. Pierre. August 8, 1923, the Attorney General advised the banking department (Opinions Attorney General 1924, p. 49), in substance, that certificates of indebtedness against the guaranty fund should be paid out of the first moneys available to the fund in the order of their respective dates of issue. Pursuant to that opinion, on July 1, 1924, the guaranty fund commission paid to holders of certificates of indebtedness issued on account of the insolvency of said Stockgrowers' Bank of Ft. Pierre 50 per cent of the face of their certificates; the amount of the payment being $254,025. Thereafter, and in April, 1925, some of the holders of certificates issued on account of insolvency of said Stockgrowers' Bank instituted a proceeding in mandamus in the circuit court of Stanley county to compel the payment of the balance due upon their certificates out of money then in the old guaranty fund. The

writ was granted by the trial court, but, upon appeal to this court, the judgment granting the writ was reversed, and this court said that the previous payment of 50 per cent to said certificate holders was erroneous and improper, and that the amount thereof "must be considered as still being in the guaranty fund." State ex rel Driscoll v. Smith, 49 S. D. 106, 206 N. W. 233, 235.

It may here be mentioned that during the period from June, 1927, to January, 1931, there have been additional failures of banks operating under the state law to the number of 73. No certificates of indebtedness against the old guaranty fund were issued to the depositors of any of these 73 failed banks. The average daily deposits of banks subject to assessment for any guaranty fund purposes at the last available return period (January 1, 1930) were $74,496,199. Complete figures showing average daily deposits for the year 1930 upon which any assessment made in February, 1931, must be based are not yet available, but they will doubtless be less than the returns made in January, 1930, for the reason (among others) that of the 73 banks which failed between June, 1927, and January, 1931, 53 failed during the interval between January, 1930, and January, 1931.

As of October 31, 1929, the total amount standing to the credit of the old guaranty fund not distributed or applied was $1,036,842. Of this amount at that time there was in open banks $834,482 and in closed banks but available $152,943, making the total amount available for distribution $987,425. There was in closed banks and not available for distribution a balance of $49,417.

The present proceeding was instituted as an original proceeding for a writ of mandamus in this court by the filing in November, 1929, of two petitions wherein the superintendent of banks, the members of the guaranty fund commission, and the state treasurer are named as defendants. The relators, in what may be denominated the main or principal petition, are the Attorney General, the county of Beadle, and two named individuals in their own behalf "and in behalf of all other persons and corporations similarly situated, who are willing to join herein as additional parties and bear their share of the expense of bringing and maintaining this proceeding." Prior to the filing of this petition, it was joined in by some eight hundred additional relators or petitioners whose names are set forth in a list, Exhibit A, attached to the petition, and each

of whom is alleged to hold a certificate of indebtedness against the old guaranty fund payable either March 1, 1924, 1925, 1926, or 1927, one of more of the petitioners representing each of said classes of certificates. Attached to and filed with said main petition was an ancillary or supplementary petition wherein the same defendants are named, and likewise the same petitioners, but the instrument is denominated "Petition of Attorney General." It states that "Your petitioner commences this proceeding in behalf of the State of South Dakota for the purpose of the protection of certain sovereign rights and prerogatives of said state and for the purpose of saving and recovering certain funds due and owing to said state." This petition further states that it is in conjunction with the main or principal petition, and refers thereto for statements of fact, and alleges a public interest by setting forth that large numbers of certificates of indebtedness against the guaranty fund are held by school districts, townships, towns, counties, and other public corporations, and by the state treasurer for public moneys, and by the rural credit board, etc. The petitions set forth a great number of facts in considerable detail, including practically all of the facts hereinbefore stated in substance, and other facts relating in detail to the claims of various petitioners, including a statement, as to each certificate of indebtedness represented by the petition, that the deposit as a result of which such certificate issued was made in reliance upon the Depositors' Guaranty Fund Law. The prayers for relief are not identical in the two petitions, but all of the petitioners joined in a motion for an order to show cause, and the prayer of that motion may fairly be taken as a statement of the relief to which petitioners deem themselves entitled. It was as follows:

"First: That the court take original jurisdiction of this proceeding.

"Second: That the court make and issue an order directing the defendants who constitute the said Depositors' Guaranty Fund Commission, and the defendant A. J. Moodie, as Treasurer of the State of South Dakota, at a time and place designated therein, to appear and show cause, if any there be, why a peremptory writ of mandamus should not issue from this court, commanding and directing them as such officers to do and perform the following official and ministerial acts:

"1.   Pay to the holders of certificates of indebtedness issued by said Depositors' Guaranty Fund Commission, payable March 1, 1924, pro rata, the money now in and belonging to said Depositors' Guaranty Fund, in the custody of and under the control of said Commission, or of the Treasurer of the State of South Dakota, and derived from assessments levied against the assets of member banks, in each of the years 1916 to 1929, both inclusive, and all additional money received into said fund in said years upon the adjustment of the credit of new member banks, and from national banks reorganizing and becoming member state banks and from the assets of insolvent member banks under said Commission's statutory right of subrogation, and money collected as interest on its deposits in banks, and from miscellaneous sources.

"2.   Continue to levy assessments against the assets of all member banks, each year, sums not exceeding in any one year, a total equal to $1\frac{1}{2}\%$ of the average total daily deposits of all the member banks during the preceding year and to collect said assessments into said Depositors' Guaranty Fund and apply the same promptly, as collected to the payment of the indebtedness due upon the outstanding certificates of indebtedness, and for no other purpose in the following order of payment:   First.   Upon certificates payable March 1, 1924.   Second.   Upon certificates payable March 1, 1925.   Third.   Upon certificates payable March 1, 1926.   Fourth. Upon certificates payable March 1, 1927.   Fifth.   Upon certificates payable March 1, 1928.

"3.   Continue making and collecting such yearly assessments and applying the same to the payment of said indebtedness until the same shall be fully paid.   And said petitioners by their counsel aforesaid, further move the court by its order to require said defendants at the time and place therein appointed, to show cause, if any there be, why they should not, in the meantime, and until the entire outstanding indebtedness of said Depositors' Guaranty Fund, on its certificates, has been fully paid, be enjoined and restrained by an order of this court, from levying assessments against the assets of member banks for any other purposes than those hereinbefore set forth, and from otherwise diverting the aforesaid assets and assessments to any other and different purpose until the entire outstanding and unpaid indebtedness upon said certificates has been fully paid."

To these petitions the defendant answered, admitting many of the fact allegations of the petition, and also setting up numerous additional facts, and claiming, in substance, that the law of 1927 was in all respects constitutional and valid, and that levies thereunder for the new individual guaranty funds had been, and were being, properly and lawfully made, and that there was no longer any authority of law whereby defendants could make any levies for the benefit of the old guaranty fund, and setting up in detail the existing situation as to the old guaranty fund, the existence of contingent and undetermined claims against it, and various reasons why distribution of money therein had not been made, which matter will be more fully hereinafter considered.

To this answer petitioners demurred.

The Bank of Gann Valley, in behalf of itself and other banks similarly situated, was permitted to intervene, maintaining the validity and constitutionality of the 1927 law, and objecting particularly to the claim of petitioners to have further assessments levied for the benefit of the old guaranty fund and to apply the proceeds of assessments already levied under the new law for the individual guaranty funds to the payment of petitioners' certificates of indebtedness against the old guaranty fund. To this petition in intervention the original petitioners likewise demurred, and, upon the issues so joined by these pleadings, the matter was submitted to this court upon printed briefs and after two days of oral argument in March, 1930.

It is apparent that there are no serious fact issues between the parties. All pertinent figures are either correctly stated in the pleadings and admitted, or may be arrived at by computation and calculation from undisputed official records and accounts. The essence of the relief demanded by the petitioners is: First, that levies for the individual guaranty funds under the new law be enjoined by this court. Second, that levies under the old law for the old guaranty fund be continued, and that the attempt to repeal the law authorizing the same be held unconstitutional. Third, that this court determine how and to whom money now on hand in the old guaranty fund should be distributed, and order distribution thereof accordingly, and in this connection petitioners further ask that assessments levied under the new law in February, 1928, and February, 1929, be treated as being in the old guaranty fund and

48

distribution thereof to petitioners be ordered, and also maintain that, in distribution of the money now in the old guaranty fund and money which may hereafter accrue thereto, the principle to be adopted and which should govern is that certificates of indebtedness against such fund due March 1, 1924, be first paid, next certificates or indebtedness due March 1, 1925, and so on, prorating in each case among all certificates due on the respective dates.

As to the first claim of petitioners, it is the contention of defendants and interveners that levies for the new individual guaranty funds have been and are being lawfully made under the new law, and should be continued. As to the second point, it is the contention of defendants and interveners that no authority of law exists, or has existed since July, 1927, for assessments for the benefit of the old guaranty fund, and that the law of 1927 repealing previously existing law authorizing such assessments was a valid and constitutional legislative enactment. As to the third point, interveners have no interest, but the position of the defendants seems to be that they have been unable to determine what to do with money now in the old guaranty fund or how to dispose of it, and would welcome any authoritative determination of that question, but their present theory as to what ought to be done with it differs considerably from the theory (or theories) of petitioners.

We will consider these propositions in inverse order.

■ We come first to the question of enjoining the continuance of assessments for the individual guaranty funds under the new law. Very clearly that is a matter as to which petitioners have entirely failed to establish any case for injunctional relief under their own pleadings. Petitioners are entitled to litigate the question of whether assessments for the old guaranty fund could be cut off, but they have made no showing that their interests are in any manner affected by a law providing for a different assessment for different purposes, and they have made no showing wherefrom it could even be inferred that an assessment of one-fourth of 1 per cent of the average daily deposits for the establishing of individual guaranty funds would in any manner interfere with or prevent the continuance of a levy of one-fourth of 1 per cent for the old guaranty fund (in which fund only petitioners are interested), if under existing law said levy for the old guaranty fund ought, or is required, to be continued. This phase of the case requires no further consideration.

We turn next to the contention of the petitioners that levies must be continued for the benefit of the old guaranty fund under the terms of the law as it existed prior to the 1927 act. The substance of their contention, variously phrased, is this: First, that petitioners became depositors in state banks in reliance upon the provisions of the existing old guaranty law, which said, among other things, that a guaranty fund should be created for the protection of all depositors in state banks, and that assessments should be made upon all state banks for the purposes of said guaranty fund; second, that, while said law was in effect, the banks wherein petitioners were depositors became insolvent, whereby (there being then no money on hand in the old guaranty fund) petitioners became creditors of said guaranty fund to the extent of the various certificates of indebtedness against the same as issued to the various petitioners; third, that, as a result of these facts, petitioners acquired some sort of vested and absolute right (as to the exact nature and origin of which counsel for petitioners are not in entire agreement), with which the Legislature of this state cannot interfere by repealing, at any time prior to the full and complete payment of petitioners' certificates of indebtedness, the law existent at the time said certificates of indebtedness were issued requiring levies upon all state banks for the purposes of the guaranty fund which is indebted to petitioners.

It will be noted that, in asking to have assessments for the old guaranty fund continued, the prayer of petitioners was that such assessments be continued and made in an amount "not exceeding in any one year, a total equal to one and one-half per cent of the average total daily deposits of all member banks during the preceding year." In this connection it should be stated that the chief counsel for petitioners maintains the position that, under the assessment provision of the old Guaranty Law (section 9011, Rev. Code 1919, as amended by chapter 122, Laws 1919), while each assessment for the benefit of the old guaranty fund was limited to one-fourth of 1 per cent, yet there was no limit as to the number of assessments that could be made in any one year until $1\frac{1}{2}$ per cent of the average daily deposits was reached. In other words, it is his contention that, under the old Guaranty Fund Law, if there was no money in the guaranty fund and outstanding claims against it, six assessments of one-fourth of 1 per cent each could be levied

in each year until such time as all claims against the guaranty fund were paid, and presumably until the fund was against built up to an amount equal to 1 per cent of the total average daily deposits for any preceding year. In this contention his associate counsel (including the Attorney General) do not, as we understand their position, concur. They admit that the maximum assessment which could be made under the old Guaranty Law for the benefit of the guaranty fund in any one year was one-fourth of 1 per cent of the average daily deposits of banks liable to assessment for the preceding year. That the permissible maximum of assessment in any one year under the old law was one-fourth of 1 per cent seems to us correct, and that construction of the old law (freely conceded by all connected with this case excepting the chief counsel for petitioners) will be assumed in all further discussion.

■■ It is clear that the Legislature in 1927 intended to, and did, repeal the old Guaranty Law. The real question on this phase of the case is as to the power of the Legislature so to do at a time when there were outstanding claims against the guaranty fund. The determination of whether or not the Guaranty Fund Law could be thus repealed may be aided by a consideration of its nature. The enactment of the law was an exercise of the police power of the sovereign state. It has been so recognized by this court in First State Bank of Claremont v. Smith, 49 S. D. 518, 207 N. W. 467. That a statute of such nature is essentially and necessarily an exercise of the police power has been clearly pointed out by the Supreme Court of the United States with reference to the Oklahoma Bank Guaranty Law. Noble State Bank v. Haskell, 219 U. S. 104, 37 S. Ct. 186, 55 L. Ed. 112, 32 L. R. A. (N. S.) 1062, Ann. Cas. 1912A, 487. See, also, State ex rel Sorlie v. First Nat. Bank, 57 N. D. 574, 224 N. W. 161; Abie State Bank v. Weaver (Neb.) 227 N. W. 922. The law has been several times before this court with reference to various phases, and divers analogies have been drawn and illustrations given by court and counsel. It has been said that the fund "is in the nature of a permanent fund to protect depositors." Mee v. Hirning, 45 S. D. 582, 189 N. W. 675, 677. It has been likened to "an insurance fund to protect the depositors." First National Bank v. Hirning, 48 S. D. 417, 204 N. W. 901, 905. Farmers' State Bank v. Smith, 50 S. D. 250, 209 N. W. 358. Whatever analogies may have been drawn,

or whatever language may have been used in illustration, it is clear upon our decisions that money in the guaranty fund is not money of the state of South Dakota; that the law contemplated that all banks operating under state law should contribute to the guaranty fund, and that the ultimate purpose of the fund should be to pay the depositors of any contributing bank which failed or became insolvent and whose assets were insufficient for that purpose. It is entirely apparent that the law contemplated that, under its terms and provisions, money of X bank contributed by assessment to the guaranty fund might be taken and used upon the insolvency of Y bank to pay depositors of Y bank, who might be entire strangers to X bank and between whom and X bank there had never been any dealings or business relations whatsoever.

That the law so resulted in operation is obvious. The depositors' guaranty fund paid to the depositors of the first 16 banks which failed an aggregate of $3,016,750. The total contribution of all of those 16 failed banks to the guaranty fund during the entire period of its existence prior to their failure, as shown by the records of the guaranty fund commission, was only $43,077. It is therefore plain that under the law there was taken and appropriated to pay the debts of those 16 banks the money of separate and distinct corporations, entirely unconnected with the failed banks, to the amount of $2,973,673. It is plain that ordinarily it would be entirely beyond the power of the Legislature to declare that the money of John Doe should be taken and appropriated to pay the debts of an entire stranger, Richard Roe, with whom John Doe had no connection or dealings, and the validity of such legislation, if it were attempted, would not be in any manner aided by the fact that John Doe and Richard Roe happened both to be engaged in the same line of business in the same state. Why, then, is such legislative action valid with regard to banks? The answer can lie only in the police power, that broad and inherent power of the sovereign state, difficult, if not impossible, of definition, by virtue of which certain legislation, not otherwise valid or consttutional, is valid in particular instances because of an intimate connection, existent under the social, economic, and political conditions of the time, between the subject-matter of such legislation and the public health, morals, or welfare. The subject-matter of the legislation is, in the words of the cases, "affected with a public interest."

Whether a business man pays his debts is primarily, under present social and economic conditions, a matter of interest only to those directly concerned. The relation of debtor and creditor in such case, generally speaking, is entered into voluntarily by free contract, not in any manner impelled or influenced by pressure of the practical necessities of the transaction of business affairs, and continues to exist as a private and personal relationship between the parties who originally entered therein and no others. The situation between a bank and its creditors is entirely different. At the present time, and as a result of the growth and development of banking and the increase in the volume and complexity of commerce and business, the chief function of the commercial bank is the manufacture and issuance of credit, and that bank credit is the circulating medium of exchange by means of which, according to the computations of different economists, from 75 to 90 per cent of the business transactions of this country are conducted and accomplished. Actual money in the sense of legal tender currency has become, as one economist puts it, "merely the small change of the business world." This bank credit is emitted in two forms: First, by note issues which circulate from hand to hand. That form of bank credit is but a small fraction of the total. By far the greater portion of bank credit is issued in the form of a deposit credit which circulates throughout communities in the form of checks, drafts, etc., drawn against the deposits. This deposit credit originates in two different ways: First, a man may deposit his own money in a bank to the credit of his account, whereby the bank becomes his debtor, and he acquires an equivalent amount of usable bank credit. Second, a man "borrows money" of the bank by which transaction he becomes the debtor of the bank and the bank his creditor. But, instead of taking the proceeds of his loan in money, he takes it in the form of a deposit credit, and in that phase of the dual transaction the bank becomes the debtor and he the creditor. By such transaction the relation of debtor and creditor arises twice—the bank once creditor and once debtor, and the individual likewise—and the net result is that the individual has exchanged his personal credit for the credit of the bank, which is a usable, circulating medium for the transaction of business.

The primary business of commercial banking is the properly balanced building up and maintaining at all times of a vast number

of such relationships of debtor and creditor—of exchanging its own credit either for the money or for the credit of its depositors, and the bank deposit credit created in that fashion is today the exchange medium whereby most business is transacted. It is divided and subdivided into various amounts, and passes from hand to hand and from bank to bank through clearing house transactions, and comes into the ownership of a vast number of people who acquire it in the ordinary course of the transaction of business, and who could scarcely stay in business should they refuse to receive it, and who have no knowledge of, or direct dealings with, the bank whence such deposit credit originally issued. If that bank credit thus in general circulation is not stable, and is not kept good in such fashion that the bank redeems it upon demand, the whole community is adversely affected. The credit does not continue to be a purely personal and private affair between the bank which issued the credit and the depositor who originally acquired it, but it has gone forth through the entire community and into a vast number of channels as the medium for conducting the business of the community. There is therefore a vital public interest in the maintenance of that credit and the stabilization thereof. If the grocers of the state do not maintain their credit and pay upon demand, comparatively few persons are affected. If the banks of the state do not maintain their credit and pay upon demand, all the business and economic interests of the state are vitally and tremendously affected thereby. The existence of this public interest is the fundamental and underlying reason which justifies laws regulating, supervising and controlling the operation of banks, and which justifies such enactments as the Bank Guaranty Law, and we know of no court which has ever attempted to justify such statutes upon any other basis. The primary object of guaranty fund legislation is not merely to guarantee the payment of creditors of banks as such, and upon that basis merely such legislation could not be validly enacted. The justification for its enactment lies entirely in the fact that so many persons are interested in the stability of bank credit, and that such credit travels so far beyond the depositors to whom it is originally extended and enters to such an extent into all the affairs and transactions of a whole community that it becomes so "affected with a public interest" that in the exercise of the police power for the public welfare

the Legislature may take steps which it deems requisite and adapted to the maintenance and stabilization of such credit, even to the extent of in some degree taking the money of one banker to pay the creditors of another, when there is no connection between said bankers, excepting the fact that they are engaged in the banking business in the same state. It is a commonplace that in the exercise of the police power the Legislature may, to a certain degree and under certain circumstances, take property without compensation, and impair or destroy vested or contract rights, when, but for the police power, it could not so do.

It is further true that, when operating in the field of the police power, a considerable amount of discretion is necessarily vested in the Legislature. The courts will determine whether or not the field is a proper one for the exercise of the police power, that is, whether or not the subject-matter of the legislation is so affected with a public interest as to justify the exercise of the police power with relation thereto. If an act of the police power operates, as it customarily does, upon one class of citizens, and not upon all citizens, the courts will determine whether the classification is a reasonable one, bearing in mind the particular end relating to public health, morals, or welfare which the act is inteded to accomplish. But, if the classification is reasonable, and if the field is a proper one for the exercise of the police power, what the Legislature sees fit to do in that field in the nature of police regulation is very largely in its discretion. It might very well be argued, and it is argued by the defendants in this case, that the same discretion in the exercise of the police power, which in 1915 authorized the Legislature to enact the old Guaranty Law because the Legislature deemed it to be for the public welfare, and notwithstanding the fact that it meant taking the money of one bank to pay the debts of another, was equally sufficient in 1927 to authorize the Legislature, when it deemed the repeal of the old Guaranty Law to be for the public welfare, to accomplish the repeal, notwithstanding the fact that it means depriving the petitioners of certain theretofore existing rights.

Beyond this, however, in our opinion, the repeal in 1927 of the provision requiring the continuation of assessments for the old guaranty fund did not impair any contracts or destroy any vested rights of petitioners within the meaning of either the state

or Federal Constitutions (Const. S. D. art. 6, § 12; Const. U. S. art. 1, § 10).

Petitioners phrase their argument both in the language of contract and in the language of vested right. They take the position that there exists some sort of a contract between the petitioners on the one hand, and the state of South Dakota, or the existing state banks, or both, on the other, pursuant to the terms of which petitioners are entitled to have assessments continued for the old guaranty fund. Petitioners also formulate the same idea in the statement that they have a vested right to have the law providing for assessments for the old guaranty fund continued in force and operation. Whatever the phraseology employed, it is their contention that they are entitled to a continuance of this law until all outstanding certificates of deposit against the guaranty fund are fully paid according to their tenor and effect. Upon this basis it would appear that the making of such assessments must continue into infinity, or until there are no banks in business operating under the state law. The present assets of the guaranty fund consist of money available for distribution in the amount of $987,-425. The guaranty fund has money not now available to the extent of $49,416, and, as will be more fully considered hereinafter, a subrogation claim against remaining assets of the Stockgrowers' Bank of Ft. Pierre to the extent of $254,025, which is of extremely problematical value, and a subrogation claim against the remaining assets of 11 of the first 16 banks which failed, and whose depositors were paid by the guaranty fund to the extent of $1,980,737, which is also of problematical value. As against these total assets, there are outstanding guaranty fund certificates in the hands of petitioners and others totaling $36,365,519, after crediting all dividends paid out of liquidation, drawing interest at the rate of 5 per cent per annum, or $1,818,275 per year. These outstanding claims against the fund are of course subject to further reduction by the application thereto of dividends resulting from further liquidation of assets of the insolvent banks out of whose insolvency the respective certificates issued.

The amount to be anticipated from such further liquidation dividends and the time when the same may be received are, of course, very largely speculative. Under present depressed conditions, and in view of the fact that said banks have already been in

process of liquidation for periods varying from two and one-half to six and one-half years, and during such time have been able to realize out of assets only the sum of $8,665,817 for application upon depositors' claims aggregating $45,031,336, it is reasonable to assume that receipts from that source will not, in the near future at least, be very large. There are at the present time 235 banks operating under the law of this state. Assuming the average daily deposits of all of said banks for the year 1930 to be $70,000,000 (which is undoubtedly more than the actual figures will show when they are available), the amount which could be derived by a levy of one-fourth of 1 per cent would be $175,000 for application upon certificates of indebtedness against the old guaranty fund, as against an accruing annual interest load thereon amounting at the present time to $1,818,275. We cannot, of course, speculate on the future of state banks in South Dakota, nor can anyone predict with accuracy how many banks will be operating under the laws of this state in one year, or two years, or ten years, or twenty years, nor what their deposits will be. There is room for speculation both ways as to how much and how rapidly liquidation of insolvent banks may decrease claims against the guaranty fund, and as to how much and how rapidly and in what direction average daily deposits of state banks may change. But the present situation would not appear to promise that the continued levy of assessments would ever be able to pay off outstanding certificates of deposit or even appreciably to diminish the continued augmentation thereof by accrual of interest. All of these matters were undoubtedly for the Legislature to consider in their discretion when they repealed the old Guaranty Law in 1927.

Turning now to the contention of petitioners that they have an enforceable contract for the continuation of these assessments, and disregarding any speculation as to what value may inhere in such contract if it existed, we are of the opinion that there is no such contract in any proper sense of the words.

Petitioners maintain that a contract came into existence when the original guaranty fund law was passed, and the then existing banks in this state, and new banks, continued to operate, or commenced to operate, and obeyed the requirements of said law. There is a considerable tendency to speak of statutory obligations in terms of contract. A duty imposed by law may be in a certain

broad sense a contract, but it is not a contract as is ordinarily understood and defined in the law. This court employed to some extent the language of contract in discussion of the Guaranty Law in First State Bank of Claremont v. Smith, 49 S. D. 518, 207 N. W. 467, and in Farmers' State Bank v. Smith, 50 S. D. 250, 209 N. W. 358.

But, in a strict sense, to say that a person or corporation, who, by virtue of being engaged in a certain business, is legally compellable to obey certain valid laws relating to the conduct of such business, is in all respects in precisely the same situation as though his obligation rested upon contract and not upon valid statute, is a fiction. It is harmless enough, and convenient for conveying certain analogies so long as it is recognized as a fiction and not pressed beyond a certain point, but, when the language of contract in relation to statutory duties is pressed to a logical conclusion, or is accepted as a verity instead of a fiction, nothing but confusion can result. A common statement is, for example, that the state may lawfully impose certain duties upon certain corporations; that, when a corporation of that kind is instituted, it impliedly assents to the existing law (and such subsequent changes therein as may validly be made), and impliedly contracts and agrees to do what the law requires. It is just as logical, just as true, and just as necessary, to say that an individual is held to know that any sovereign state is entitled to pass laws for the governance of its inhabitants; that, when he becomes an inhabitant of any state, he is held to know what its laws are; that he impliedly assents to such laws by the act of becoming an inhabitant of the state, and thereby impliedly promises, contracts, and agrees that he will obey such laws. Therefore, if a law of the state forbids murder, and the individual commits murder, he has committed a breach of contract. In a certain very broad sense this may be true in both cases, and the phraseology of contract may be convenient for conveying the conception, which is undoubtedly true, that in some respects and particulars a person or corporation who is lawfully subject to the operation of a certain law is in a condition quite similar to what he would have been had he entered into a contract to do the things which the law requires. The fact is, however, that he has not entered into any such contract, and his position is not in all respects similar to what it would have been had he so contracted. The simple

truth is that a person legally compellable to obey a valid law is so compellable in point of fact, whether he assents to the law or not, and whether he knows of the law or not, by sheer force of the law itself and the sovereign power of the state to enforce its laws. To rest this obligation upon an implied promise of the person rather than upon the existence of law is, at least beyond a certain point, purely fictitious, entirely unnecessary, and confusing to clear thinking. The statutes of this state clearly recognize the distinction between an obligation arising from contract and an obligation arising from operation of law. Sections 721, 722, 803, and 804, Rev. Code 1919, read respectively as follows:

"An obligation is a legal duty by which a person is bound to do or not to do a certain thing."

"An obligation arises either from:

"1. The contract of the parties; or,

"2. The operation of law.

"An obligation arising from an operation of law may be enforced in the manner provided by law, or by civil action or proceeding."

"A contract is an agreement to do or not to do a certain thing."

"It is essential to the existence of a contract that there should be:

"1. Parties capable of contracting;

"2. Their consent;

"3. A lawful object; and,

"4. Sufficient cause or consideration."

It seems plain that a duty arising from operation of law is not a contract in any such sense as is defined in sections 803 and 804, supra, and there is no necessity for using the language of contract concerning it. So in the instant case the plain truth is that the duty to pay assessments and the other duties imposed upon the banks of this state by the guaranty fund law are no more and no less than duties imposed by operation of law by the Legislature of this state in the valid exercise of its police power.

We turn, then, to the question of whether petitioners have any vested right in a constitutional sense to have the Bank Guaranty Law remain unchanged. It is, of course, the general rule

that citizens have no vested right in the existing general laws of the state which can preclude their amendment or repeal, and there is no implied promise on the part of the state to protect its citizens against incidental injury occasioned by changes in the law. Cooley on Const. Limitations cited in Graves v. Howard, 159 N. C. 594, 75 S. E. 998, Ann. Cas. 1914C, 565.

"In organized society every man holds all he possesses, and looks forward to all he hopes for, through the aid and under the protection of the laws; but as changes of circumstances and of public opinion, as well as other reasons affecting the public policy, are all the while calling for changes in the laws, and as these changes must influence more or less the value and stability of private possessions, and strengthen or destroy well-founded hopes, and as the power to make very many of them could not be disputed without denying the right of the political community to prosper and advance, it is obvious that many rights, privileges, and exemptions which usually pertain to ownership under a particular state of the law, and many reasonable expectations, cannot be regarded as vested rights in any legal sense." Cooley's Constitutional Limitations (8th Ed.) 11, 746.

To this general rule there are some exceptions, and one of them upon which petitioner relies in this case may be substantially stated thus: that, when a valid law imposes a duty upon a person or corporation, the law cannot thereafter be repealed to the prejudice of third persons who have in the meantime dealth with such person or corporation on the faith of the law. This undoubtedly is true, and in this connection petitioners cite such cases as United States ex rel Van Hoffman v. Quincy, 4 Wall. 535, 18 L. Ed. 403, holding in substance that, when the statute authorizing a bond issue also authorizes the annual levy of a tax to meet and discharge the bond obligation, the rights of bondholders are impaired by a repeal of the law providing for the tax levy before bonds are paid. Also Fremont, etc., Ry. v. Pennington County, 20 S. D. 270, 105 N. W. 929, 931, wherein it is said:

"In counties having bonded indebtedness, sinking funds cannot be dispensed with, because they were provided for and became a part of the contract when the indebtedness was created."

Also Ettor v. City of Tacoma, 228 U. S. 148, 33 S. Ct. 428, 57 L. Ed. 773, holding in substance that, where a statute provides

that a city shall pay compensation for damages by change of grade of street, and a change of grade is made while such compensation statute is in force, subsequent repeal of the statute requiring payment of compensation cannot discharge the obligation of the city to pay compensation for changes which were made while the compensation statute was in operation.

All of these cases are, of course, sound, but the difficulty is that they have no application to the present situation. In every one of those cases there was a law imposing a statutory obligation. While that law was in force, there were contracts or dealings between third persons and the identical persons upon whom the legal duty was imposed. The courts properly held that under such circumstances the legal duty entered into and became a part of the contract or dealing, and could not thereafter be removed out of the situation by legislative action to the prejudice of either party. In the instant case that is not the situation. There is no such legal entity in this state as an aggregate of all banks operating under the state law. The requirement of the 1915 law was that each individual bank pay certain assessments to a guaranty fund. The 1927 law relieved those banks from making further payments to a guaranty fund. The petitioners in this case never had any dealings whatsoever in contract or otherwise, so far as this record shows, with the banks which were discharged from further payment of assessments by the 1927 law. Petitioners never received any promises or agreements from those banks, and never advanced to those banks any consideration for promises or agreements. The only contracts petitioners ever had with any banks were the contracts they made with the banks wherein they made their deposits. The deposit contract on the part of the bank was that the deposit would be repaid on demand, and, assuming the existing law to enter into and become a part of the contract, that the bank wherein the deposit was made would contribute annual assessments to the guaranty fund for the conjoint benefit of its own depositors and all other depositors in all other banks operating under the state law. It may very well be that the Legislature could not by change of the law excuse the only banks with which petitioners dealt from continuing to contribute to a guaranty fund if petitioners would be thereby prejudiced, but that is purely an academic question, for those banks have failed, and all their assets have become, in sub-

stance, the property of their creditors. The fallacy in petitioners' reasoning lies, we think, in the assumption that, when each petitioner made a deposit contract with the bank wherein he made his deposit, he at the same time, in some vague or mystical fashion, also made a contract with every other bank operating under the state law. This, we think, was not the case.

We are cited to no decisions of other courts holding a Guaranty Fund Law to be irrepealable during the existence of outstanding claims against the fund. There were, we think, no vested rights arising out of the operation of the Guaranty Fund Law, excepting this: When money or other thing of value arising from assessment or otherwise actually and lawfully came into the guaranty fund at a time when valid demands against the fund were outstanding, the holders of such valid demands against the fund thereby acquired a vested right in and to such money or other thing of value, or so much thereof as might be necessary to meet their demands, and that was a right of such nature as not to be subject to judicial or legislative impairment. The holders of certificates against the old guaranty fund are entitled to whatever is in the guaranty fund or may hereafter come into it, and of that right they cannot be deprived by legislative action, nor has any such attempt been made by the Legislature.

The inescapable facts in this case render necessary the conclusion that the guaranty fund scheme proved in actual operation, under the conditions which it was required to meet, and for whatever reasons, entirely unable to accomplish what was hoped for it. Whatever assets remain in the insolvent banks wherein their deposits were made properly applicable to that purpose will, of course, be received by the petitioners, but we can see no reasonable expectation of their receiving anything from the guaranty fund beyond what is now therein. The facts are harsh, but undoubtedly the quicker they are faced and realized by all concerned, and false and specious hopes abandoned, the better the situation will be. The guaranty fund experiment in this, as in other states where it was attempted, has failed completely. Professor Robb, writing of the general situation (2 Encyclopedia Social Sciences, p. 418) says:

"The time during which these laws were in operation may be divided into two periods. The period prior to 1920 was in general one of prosperity and rising prices. Banks were in a strong posi-

tion and the few sporadic failures were easily taken care of by the guaranty funds. Oklahoma was the one exception. In this state the collapse of a real estate boom in 1911 carried with it a large number of banks and by 1914 the guaranty fund was in debt to the extent of $800,000. By 1920, however, this indebtedness was liquidated because war prosperity swelled the income from assessments.

"In the period following 1920 the guaranty laws were severely tested. The post-war depression was especially protracted in agricultural states; and the concentration of bank failures following in the wake of this disaster proved the undoing of most of the guaranty laws. When serious losses began to accumulate in the various states most banks forsook the voluntary systems, and many of those operating under the compulsory systems sought relief by becoming national banks. This further weakened the guaranty systems, until in many cases the assessments fell far short of meeting the interest accruing on unpaid losses.

"Oklahoma repealed her law in 1923, making no provision for liquidating the indebtedness. In Nebraska after more than one-fourth of the banks had closed with a net loss of over $20,000,000, the guaranty fund was abandoned in 1930. In North Dakota the deposit guaranty law was repealed after nearly half of all the state banks had failed. South Dakota, with a net loss of over $25,000,-000, repealed the insurance feature of her law, so that now the assessments of a bank protect only its own depositors. One large bank in Washington failed and the other banks, unwilling to meet the loss, speedily abandoned the law. The Kansas banks also withdrew from their voluntary systems. In Texas the banks discarded the insurance plan and a court decision rendered ineffective the bond security system; the law was repealed in 1927. The indebtedness amounting to $3,500,000 in Mississippi will take eighteen years to liquidate at the present rate of assessment. Much liquidation is yet to be accomplished and it will be years before the results of this banking experiment are fully known.

"In attempting to determine the causes of this disaster one must emphasize that the experiment was essentially a matter of insurance. Aside from incompetence and corruption, concentration of loss is the element that wrecks most insurance projects, as it did in this case. Guaranty laws have been restricted to single agricul-

tural states in which people make their living largely from one or more crops, such as corn, wheat or cotton. Crop failures or extreme declines in prices render such communities prostrate. In a period of prosperity all goes well; but when prices collapse and depressions occur the mortality of poorly managed, independently owned banks having insufficient resources is appalling. It is clear that with the present methods of controlling losses the pooling of bank resources within the limits of single states is entirely inadequate in such periods. The concentration of loss resulting from the multiplicity of poorly managed banks, the lack of diversity of economic interests and the condition of general business depression wrecked the guaranty laws. This experience does not demonstrate that bank deposits cannot be insured; it does show, however, that success is dependent on greater economic and geographical diversification and further control of the hazard."

The experiment has not succeeded. Obstinate refusal to recognize that situation can neither change nor improve the stubborn facts. We are unable to perceive any constitutional rights vested in the petitioners in this case of a kind or nature sufficient to require the Legislature of this state to continue in further effect a police power measure, the utter inadequacy and insufficiency of which has been so definitely and completely demonstrated.

■ We turn now to the question of disposition of existing assets of the old guaranty fund. Petitioners have demanded that payments made in 1928 and 1929, pursuant to assessments levied under the new law for individual guaranty funds, and now in the hands of the state treasurer in the form of cash or approved securities, be treated as being in the old guaranty fund and paid over to such of petitioners as hold certificates of indebtedness against the old guaranty fund due and payable March 1, 1924. This, of course, would be utterly impossible upon any theory. These moneys and securities are now in the hands of the state treasurer, because they were required to be placed there pursuant to the terms of the 1927 law (chapter 54), which specifically provided that such moneys and securities "shall become and at all times remain, the property of the stockholders of said bank as the individual ownership of said stock shall be disclosed by the books of said bank; subject, however, to the uses provided by this Act." Section 4, amending section 9011, Rev. Code 1919, as amended by Laws 1919,

c. 122. Even if the 1927 law for assessments for individual guaranty funds were invalid (which it is not), and even if the legislative act abrogating further assessments for the benefit of the old guaranty fund were beyond the legislative power (which we hold is not the case), it would seem quite plain that the money and securities now in the hands of the state treasurer are the property of the stockholders of the banks which placed them there; and for this court, in a proceeding to which the owners of said moneys and securities are not even parties, to order said money and securities paid to certificate holders against the old guaranty fund of date March 1, 1924, a proposition entirely foreign to the law by which the moneys and securities were deposited, would be plainly and utterly unlawful.

We come now to the question of priorities. It is the prayer of petitioners that moneys now in the fund be prorated among those of petitioners who hold certificates due March 1, 1924, and they rely upon the holding of this court in State ex rel Driscoll v. Smith, 49 S. D. 106, 206 N. W. 233. It is to be observed that the situation in that case was negative and not affirmative. There was no attempt on the part of this court to direct how distribution should be made. In April, 1925, the holders of certificates against the fund issued upon the insolvency of the Stockgrowers' Bank of Ft. Pierre instituted a proceeding in mandamus in circuit court to require the payment of moneys then in the guaranty fund upon their certificates. That bank was the first bank to fail after the cash of the guaranty fund was exhausted, and the certificate holders who were party plaintiffs in that proceeding constituted the holders of the first group of certificates issued. That group of certificates was due March 1, 1924, and thereafter and prior to March 1, 1924, upon the insolvency of other banks, other groups of certificates were issued with the same due date. The circuit court granted the mandamus prayed for, and appeal was taken to this court. On that appeal this court was not attempting to adjudicate the rights of all certificate holders, but only those of the then plaintiffs. This court dismissed chapter 100, Laws 1925, from consideration in that case, for the reason that the court held that the emergency clause of that law was invalid, and that consequently that law was not in force and effect when the action was instituted in April, 1925. The court did not consider in any

manner the validity of chapter 100, Laws 1925, or what effect, if any, it might have upon the situation after its effective date, July 1, 1925. This court held that the claimed priority right of plaintiffs in that case must be found to be existent or nonexistent in accordance with whether or not it was given pursuant to the terms of the law which was in effect when the priority was asserted and action instituted to enforce it, being section 9020, Rev. Code 1919, as amended by chapter 134, Laws 1921; and this court, having before it for adjudication no more and no less than the claimed priority rights of the plaintiff in that proceeding, reversed the lower court, holding that, under the terms of the law in effect at the time that action was instituted, there was no legislative intent to give priority to certificates in accordance with their date of issue, but that it was the intent of the law as it then existed (and no other law was applicable to that particular case) that certificates against the guaranty fund should be paid in order of their maturities without priority as between certificates of the same maturity date; that is, first, all certificates due March 1, 1924, should be paid; then all certificates due March 1, 1925, etc. The decision was rendered December 9, 1925, subsequent to the taking effect of chapter 100, Laws 1925, but the situation adjudicated had to be considered in that case as of the date when the action was instituted, which was in April, 1925, and prior to the effective date of chapter 100, Laws 1925.

Chapter 100, Laws 1925, effective July 1, 1925, in substance provided for pro rata application of moneys then in the guaranty fund or thereafter to be received into the fund upon all certificates of indebtedness against said fund previously issued or thereafter to be issued without any priority of any nature between said certificates, either in accordance with dates of issue, dates of maturity, or otherwise, in proportion to the unpaid principal amounts of the respective certificates at the time of any pro rata payment. It is the contention of petitioners, as we understand it, that as to all certificates of indebtedness issued prior to July 1, 1925, chapter 100, Laws 1925, can have no force or effect, but that the priority right of such certificates to payment out of the guaranty fund in order of their maturity date, pursuant to the pre-existing law as construed by this court in the State ex rel Driscoll Case, became fixed and vested at the time the certificate issued. This was substantially

the contention of the plaintiff in the case of Oss v. Depositors' Guaranty Fund Commission, 48 S. D. 258, 204 N. W. 21, hereinbefore referred to. This court refused to entertain original jurisdiction of the Oss Case, and the published opinion therein deals with nothing but the jurisdictional point. In the brief filed in that case by the office of the Attorney General, in behalf of the defendant guaranty commission (and, to avoid possibility of misunderstanding, we here point out that the Oss Case was heard in 1925, and that the then Attorney General was not the present Attorney General, but his predecessor in office), the contention of the plaintiff on the point of a claimed vested right of priority of payment was answered in the following language:

"The Depositors' Guaranty Fund was and is created for a public purpose only and that under the police powers of the state. The manner of the disbursement of the fund is, therefore, subject to change at any time by the legislature of the state. The only vested right thereto is in the state and its executive agency, the Guaranty Fund Commission. The depositor in a going bank or a suspended bank acquires no vested right in the fund. Wirtz v. Nestos [51 N. D. 603], 200 N. W. 524, and authorities cited in the opinion.

"The purpose of our guarantee law is to protect all depositors in state banks, not to protect a small part of such depositors at the expense of the much greater number. Wirtz v. Nestos, supra.

"Section 9020, R. C., as amended by chapter 134, Laws of 1921, only provides how guaranty fund certificates shall be paid when issued to the suspended bank. It then provides that such certificates may be made payable directly to the depositor and does not state how the certificates so issued shall be paid. The amendment providing for such issue to the depositor contemplated the emergency which arose. The petitioner's certificate was so issued to him. Senate Bill 269 appropriately provides the manner in which such certificate shall be paid, and the provisions for payment pro rata is calculated to serve the purpose of the guaranty law since it gives equal protection and benefits to all certificate holders. Wertz [Wirtz] v. Nestos.

"The fact that a certificate had in this case issued to petitioner does not change his case from that of the petitioner in Wertz [Wirtz] v. Nestos. (It will be noticed that this case was not an

original proceeding in the North Dakota Supreme Court but an appeal.) The certificate is only evidence of his allowed claim against the suspended bank and that such claim belongs to the class covered by the guaranty law. The manner of his payment out of the guaranty fund was still subject to the will of the legislature. This is clearly indicated in Wertz [Wirtz] v. Nestos [51 N. D. 603], 200 N. W. at pages 530, 531, citing State v. Mayor, 109 U. S. 285 [3 S. Ct. 211], 27 L. Ed. 936, and 2 Story Const. (5th Ed) 674. The court said:

"'The assessment, creation and administration of the fund, from whatever standpoint considered, are made pursuant to a legislative policy, which may be changed at will.'

"The court concludes that the guaranty law or its administration gives rise to no contract obligations and says:

"'To direct the time, the manner, or the method of disbursing such fund would be an interference by the courts with the exercise of governmental functions and a judicial administration of a law enacted pursuant to the police power and in furtherance of the public interest, the public safety and the public welfare.'"

The intention as to priority inherent in the original portion of the law providing for method and time of payment [section 9020, Rev. Code 1919], and in the law amendatory thereof before 1925 [chapter 134, Laws 1921], gave rise to no lien claims upon the fund or anything of that sort [Lacey v. State Banking Board, 118 Tex. 91, 11 'S. W. (2d) 496; Lydick v. State Banking Board, 118 Tex. 168, 12 S. W. (2d) 954]; and all such directions as to payment were based upon the assumption that the guaranty fund was and would continue to be solvent, and would be able ultimately to discharge all obligations against it. The only intention as to time of payment was to establish priority in time between creditors of the fund, all of whom would ultimately, according to the contemplation of the law, be paid in full. There was no intention in the law that some holders of certificates of indebtedness should be paid in full out of the fund and that others should receive nothing. At the time of the passage of chapter 100, Laws 1925, it was perfectly plain that the guaranty fund was completely and hopelessly insolvent, and could never be made anything else. The Legislature of 1925 was justified in taking cognizance of that fact, and, in substance, by chapter 100, Laws 1925, treating the guaranty fund

as an insolvent fund, and ordering distribution thereof to claimants against the fund in proportion to the amounts of their respective claims without regard either to the issue date or due date of their respective certificates. We are therefore of the opinion that distribution from the fund must be made to all certificate holders in proportion to the amounts due and unpaid upon the principal of their respective certificates at the time of distribution.

■ ■ It is apparent, therefore, that distribution of assets of the old guaranty fund in substance amounts to the distribution of an insolvent fund ratably among a vast number of claimants, and that it involves the rights of many persons not before this court in this proceeding. The administration of an insolvent fund, under circumstances such as are here involved, cannot be handled by the machinery of mandamus. As stated by this court, quoting an Oklahoma decision, in State ex rel Flanagan v. South Dakota Rural Credits Board, 45 S. D. 619, 189 N. W. 704, 707:

"Mandamus is not an appropriate remedy to compel a general course of official conduct or a long series of continuous acts, as it is impossible for the court to oversee the performance of such duties. The proper function of a mandamus is to compel the doing of a specific thing; something which can be neither diminished or subdivided."

To that general effect the authorities could be multiplied indefinitely. It seems to us very clear that we can award no writ in this matter, and that the only court which could take charge of and superintend the administration of an insolvent trust fund (if such judicial superintendence were necessary) would be a court of general and original equity jurisdiction under proper procedure.

In the ordinary case we would stop at this point. In the instant case, however, it is, we think, important that distribution of this fund should be undertaken at as early a date as can be done. Many interests are involved. All parties to this proceeding have submitted for our consideration by their pleadings and have fully argued many questions relating to the distribution of the fund. The petitioners want distribution, and are entitled to it. Defendants indicate, in substance, that they would gladly make distribution if they could only be reliably informed how safely and properly to go about it. Material questions are presented by the pleadings and have been argued herein which can hardly be determined, save by

a court of last resort. Under the special and peculiar circumstances of this case, we are therefore led with some considerable hesitation to venture into a field which ought rarely, if ever, to be entered by courts, and to express our views on some of the points presented by the pleadings herein, notwithstanding the fact that it is impossible for us, in a proceeding of this nature, properly to make any binding adjudication thereof. We are induced so to do in the hope that we may thereby assist in avoiding further litigation and expense for petitioners and all concerned in the distribution of the guaranty fund, and assist in bringing the entire matter to a termination.

Available money on hand should be distributed. Figures before us indicate that there was on October 31st, approximately $987,425. Its present amount can be readily ascertained.

In making that distribution, chapter 100, Laws 1925, should be the guide, and distribution should be to various certificate holders in porportion to unpaid principal amounts with no recognition of priorities because of date of issue, date of maturity, or otherwise, save only that the holders of certificates issued on account of the insolvency of the Stockgrowers' Bank of Ft. Pierre, having previously and without authority of law received a dividend from the guaranty fund of 50 per cent upon their certificates paid July 1, 1924, should be excluded from any participation in distribution up to the point (if ever reached) when dividends by distribution from the guaranty fund amount to 50 per cent of principal amounts now unpaid.

Payment of dividends from the guaranty fund will result in no right of subrogation except in such cases (and they will be few, if any) as the dividend from the guaranty fund completely pays the amount due upon any certificate of indebtedness at a time when assets still remain in the insolvent bank in connection with whose insolvency the particular certificate was issued. A fractional right of subrogation might then arise. The likelihood of such event is so small that it may, for practical purposes, be disregarded.

When cash now available for distribution is paid out, the assets of the guaranty fund will consist of such cash as the fund has which is in closed banks or for some other reason not presently available for distribution, but may become so hereafter. The amount of that item on October 31st is given as $49,416. The

guaranty fund also has a subrogation claim to the amount of 50 per cent of the claims of depositors holding certificates issued on the insolvency of the Stockgrowers' Bank of Ft. Pierre against the remaining assets of that bank. Of the first 16 banks which failed whose depositors were paid in full out of the guaranty fund, the liquidation of 5 has been completed. The subrogation claims of the guaranty fund against those banks amounted to $676,287, on which $340,192 has been paid as dividends from liquidation. This amount is represented in the cash now in the guaranty fund, and, those banks having been completely liquidated, no further subrogation can accrue from them. As to the remaining 11 banks which are still in course of liquidation, the subrogation claim of the guaranty fund is $1,980,737. The tangible assets of said banks remaining on hand amount to a book value of $1,069,463, against which there are liabilities in addition to the subrogation claim of the guaranty fund amounting to $181,164. The guaranty fund commission should, we think, exercise its best judgment in realizing upon the subrogation claims as rapidly as may be done without an utter sacrifice of assets of liquidation against which the subrogation claims lie. It is apparent that there will not be a large residual value in the guaranty fund after the cash now on hand is distributed, and distribution in April of each year as provided in chapter 100, Laws 1925, may be impracticable, and such annual April distribution need not, in our opinion, be attempted, if the amount of cash on hand is not sufficient to permit any substantial payments. As a practical matter, it will probably be found that the situation can be handled by at most one final dividend after the distribution of the present cash on hand. If there should ultimately be a residue in the guaranty fund too small for any effective distribution, it can undoubtedly be properly disposed of by legislative act when that time arrives. We think the necessary expense of distribution can be paid out of the fund distributed.

Defendants point out that under the decision of this court in Rundell v. Hirning, 49 S. D. 102, 206 N. W. 231, failure of a claimant to file his claim against an insolvent bank with the superintendent of banks, pursuant to section 8933, Rev. Code 1919, has no effect on his right to participate in the bank guaranty fund, even that he may file a claim against the bank guaranty fund, even though his right to file a claim against the assets of the insolvent

bank has been barred by the statute, and defendants allege that there are a vast number of contingent but unasserted claims against the guaranty fund. Assuming this to be true, we think defendants are nevertheless under no obligation at the present time to withhold from distribution any portion of the guaranty fund as a protection against such claims. The value of a claim against the guaranty fund is not so great that many are likely to be hereafter asserted. The last bank by virtue of whose failure claims could be asserted against the guaranty fund failed prior to July 1, 1927. If any persons hereafter assert claims against the guaranty fund, the validity of such claims can be determined when they are asserted. If such claims are not established until a time when there is nothing left in the guaranty fund in which they can participate, the claimants will have to be the sufferers from their own laches. This applies also to claims against the fund rejected by the superintendent of banks and whereon legal action has not been instituted.

Defendants assert that disputed claims against the guaranty fund are in process of determination in the courts in some cases, and that under the decision of this court in Ahearn v. Smith, 50 S. D. 633, 211 N. W. 448, if such claims are decided in favor of the claimant, claimant will be entitled to a certificate against the guaranty fund as of the date when the bank in connection with which the claim is made became insolvent. It is a simple matter to compute the amount of such claims and to withhold from distribution a sufficient amount to pay the dividend accruing to them if they are ultimately allowed, and they will undoubtedly be determined one way or the other before final distribution. A number of other questions concerning distribution presented by the pleadings are disposed of by our holding heretofore made in this opinion to the effect that there is no priority between certificates in accordance with maturity dates, and that chapter 100, Laws 1925, is a valid and effective act relating to the distribution of the fund. Defendants say that in many cases the dividend applicable to outstanding certificates of indebtedness would be fractional amounts of one cent. We think the commission in computing and making distribution is entitled to disregard certificates whereon the dividend would be so small that it cannot, as a practical business matter, be paid.

In conclusion, it is our view that the assets of the old guaranty

fund ought to be distributed as far as possible and the matter closed. We think the distribution can be worked out along the lines herein suggested.

The demurrers will be overruled, and the application of petitioners for a peremptory writ of mandamus must be denied. No costs will be taxed.

MISER, C., sitting in lieu of ROBERTS, J., disqualified. POLLEY, P. J., and BROWN and MISER, JJ., concur. BURCH, J., concurs in the result.