STATE, Respondent v. NUSS, Appellant

(114 N.W.2d 633)

(File No. 9941. Opinion filed April 11, 1962)

**Acie W. Matthews,** Sioux Falls, for Defendant and Appellant.

**A. C. Miller,** Atty. Gen, **Robert D. Hofer,** Asst. Atty. Gen., Pierre, **William F. Clayton,** State's Atty., **Roger A. Schiager,** Asst. State's Atty., Sioux Falls, for Plaintiff and Respondent.

**Thomas J. Simmons,** Sioux Falls, **Stephens, Riter & Mayer,** Pierre, **George Gisler,** Kansas City, Mo., amicus curiae.

HANSON, J.  This is a criminal action prosecuted by the State against W. P. Nuss, who is a solicitor of students for Gale Institute, Inc., a privately owned vocational training school located in Minneapolis, Minnesota. On October 12, 1960 defendant Nuss collected from Geraldine Helm of Sioux Falls, South Dakota, the sum of $150 as advance tuition for a course of instruction in automation (operation of IBM machines). Defendant was thereafter charged with and convicted in the Municipal Court of Sioux Falls of the offense of collecting tuition in excess of $25 in advance of a pupil's actual attendance at school in violation of SDC 1960 Supp. 13.1114, which provides as follows:

> "No person, firm or corporation or any college or school, which is not supported by a church or religious organization, or a fraternal organization, or by the state or any of its political subdivisions, shall collect tuition or other charges in excess of twenty-five dollars in advance of actual attendance of pupils in such school. Charges for correspondence courses shall not exceed twenty-five dollars in advance of the receipt and approval by the pupil of the first assignment of such courses. No action shall lie to recover on a contract for tuition or other charges from a prospective student in advance of such attendance, or

receipt and approval by the pupil of the first assignment of correspondence courses. Any violation of this provision shall be a misdemeanor and upon conviction thereof such violator shall be subject to a fine of not to exceed two hundred dollars or by imprisonment in the county jail for not to exceed thirty days." (originally enacted as Chapter 89, Laws of 1959)

The complainant, Geraldine Helm, is a resident of Sioux Falls. In September 1960 she saw an ad in the local newspaper concerning a course in automation offered by the Gale Institute. She wrote a letter of inquiry to the Institute which was forwarded by it to the defendant, W. P. Nuss, who was the school's examiner and solicitor of students in North and South Dakota. Thereafter defendant called on complainant. He interviewed her in the presence of her father. She filled out a questionnaire and defendant determined she was qualified to attend Gale Institute subject to the approval of the school. Geraldine and her father were advised about the course in automation, the amount of tuition required, where the scho᷊ was located, and other pertinent facts. Geraldine agreed to attend. A written contract was signed on October 12, 1960 by both Geraldine and her father, and they paid defendant the sum of $150 as advance tuition. Defendant read the contract in its entirety before it was signed by Geraldine and her father. Thereafter, for some reason not shown in the record, Geraldine failed, or refused, to attend the school and this prosecution followed.

The Gale Institute is a privately owned vocational training school located in Minneapolis. It was organized over twenty years ago and in the course of its history has trained and placed thousands of students in various occupations. It has never refused to admit complainant as a student. There is no issue regarding the reasonableness of the total tuition charged complainant, the worth of the course, or the ability of the school to furnish the training contracted for. Likewise, there is no issue con-

cerning defendant's conduct or integrity. There is no allegation or claim he misrepresented, misled, or deceived complainant in any manner. The sole substance of the crime against defendant is that he collected tuition in excess of twenty-five dollars from a prospective student in advance of actual school attendance.

Defendant assails the constitutionality of the statute under which he was convicted on numerous grounds. In view of our conclusion, it is only necessary to consider his contentions that it is an unreasonable and arbitrary exercise of the police power and deprives him of his freedom to contract in violation of Section 2, Art. VI of the South Dakota Constitution.

■ ■ In considering these issues we are aware of the presumption of validity which attaches to all legislative acts and "no statute should be held unconstitutional by any court unless its infringement of constitutional restrictions is so plain and palpable as to admit of no reasonable doubt." State ex rel. Botkin v. Welsh, 61 S. D. 593, 251 N.W. 189; Mundell v. Graph, 62 S.D. 631, 256 N.W. 121. We are also aware that a court does not sit "as a super-legislature to weigh the wisdom of legislation". Day-Brite Lighting, Inc. v. Missouri, 342 U.S. 421, 72 S.Ct. 405, 96 L.Ed. 469.

■ Economic freedom is one of the inherent rights guaranteed to all men by Sec. 1, Art. VI of the South Dakota Constitution and protected by the due process clause. Sec. 2, Art. VI. The term "liberty" used in the Constitution means more than freedom from arrest or restraint. It includes freedom of action; freedom to own, control, and use property, and freedom to pursue any lawful trade, business, or calling. This freedom to pursue a lawful business and to own and control property also includes freedom to make all proper contracts in relation thereto. 11 Am.Jur., Constitutional Law, § 339.

[4] On the other hand freedom of contract is not an absolute right or superior to the general welfare of the

public. It is subject to reasonable restraint and regulation by the state, under the police power, to protect the safety, health, morals, and general welfare of the people. As explained by the United States Supreme Court in Chicago, B. & Quincy R. R. Co. v. McGuire, 219 U.S. 549, 31 S.Ct. 259, 55 L.Ed. 328, "freedom of contract is a qualified, and not an absolute, right. There is no absolute freedom to do as one wills or to contract as one chooses. The guaranty of liberty does not withdraw from legislative supervision that wide department of activity which consists of the making of contracts, or deny to government the power to provide restrictive safeguards. Liberty implies the absence of arbitrary restraint, not immunity from reasonable regulations and prohibitions imposed in the interests of the community."

Although freedom of contract has traditionally been considered to be the general rule and economic restraint the exception, which could be justified only under exceptional circumstances, there is no longer much question concerning the broad discretion possessed by the legislature to regulate any and all business for the protection of the health, safety, morals, and general welfare of the people. This trend toward economic regulation is particularly evident in the area of price control. See "Our Constitutional Heritage" 45 ABAJ 1027. Formerly the legislature was considered to be without power to fix prices at which commodities could be sold, services rendered, or property used, unless the business or property was "affected with a public interest" such as a public utility operating under a franchise or a business monopolistic in nature. Now the term affected with a public interest means "no more than that an industry, for adequate reason, is subject to control for the public good." Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940; Olsen v. Nebraska, 313 U.S. 236, 61 S.Ct. 862, 85 L.Ed. 1305. Consequently, the authority of the legislature, under the police power, to reasonably regulate private schools and their agents and solicitors must be conceded. State v. Williams, 253 N.C. 337, 117 S.E.2d 444.

■ Nevertheless, due process still requires that any exercise of the police power be reasonable, City of Sioux Falls v. Kadinger, 74 S.D. 217, 50 N.W.2d 797, and the regulatory means adopted by the legislature must bear a real and substantial relation to some actual or manifest evil, Defiance Milk Products Company v. Du Mond, 309 N.Y. 537, 132 N.E.2d 829, and cannot be unreasonable, arbitrary, or capricious. The determination of such issues is a judicial function and when a measure is found to be in violation of our fundamental law it is void. Consequently, it not only is the right, but the duty of this Court to so declare it. Ex parte Hawley, 22 S.D. 23, 115 N.W. 93, 15 L.R.-A.,N.S., 138; Hertz Drivurself Stations v. Siggins, 359 Pa. 25, 58 A.2d 464, 7 A.L.R.2d 438.

■ The statute does not contain a declaration of its purpose or the evils it seeks to curb. Its object, we are told, is to safeguard youthful high school graduates against the fraud and deception of high pressure solicitors employed by privately owned vocational schools. The shot pattern of the act is not so limited. The mantle of its protection extends to adults as well as minors. The only educational institutions clearly exempt from the restrictions and penal provisions of the act are schools supported by (1) a church, (2) a religious or fraternal organization, and (3) the State of South Dakota, and its political subdivisions. All other schools and educational institutions, public and private, apparently fall within its ambit. This includes (1) all privately owned trade, vocational, and correspondence schools operated for profit wherever located, (2) all privately endowed educational institutions not operated for private gain and not having any church or fraternal affiliations which include some of the oldest and most honored and respected institutions of higher learning in America, and (3) all schools, colleges, and universities supported and maintained by states other than South Dakota. Although the constitutionality of such classification is not before us, it patently reflects the unreasonable nature of the act as a whole.

The main stem of the act is the prohibition against collecting tuition or other charges in excess of twenty-five dollars in advance of actual attendance of pupils in school. It is this restriction which defendant contends violates his constitutional freedom of contract, is unreasonable and arbitrary, and bears no reasonable relationship to any declared or manifest evil. On the other hand, we are informed, this limitation on advance tuition strikes at the heart of the evils sought to be curbed by the act, i. e., the substandard privately owned business or vocational school which (1) employs high pressure solicitors; (2) requires unreasonably large payments in advance of instruction; (3) enters into binding contracts with prospective students with "no refund" provisions; (4) guarantees placement upon completion of a course; (5) offers bogus scholarships; (6) gives meaningless aptitude tests; (7) engages in false advertising and misrepresentation; (8) offers worthless subjects; (9) has inadequate facilities; (10) employs inferior and unqualified instructors; and (11) charges exorbitant tuition.

The police power of the state may properly be used to prevent fraud and deception wherever found and private schools are not exempt from such reasonable remedial legislation. Other states have recognized the same evils enumerated above and have enacted comprehensive regulatory measures designed to suppress them. See Chapter 739 of the 1961 Minnesota Session Laws, and Chapter 32, Article 77 of the 1961 Cum.Supp. to the Anno. Code of Maryland. By way of illustration, the Maryland law requires every solicitor for a non-public school, as defined in the act, to obtain an annual permit from the State Superintendent of Schools. Each applicant must submit to the State Superintendent "a copy of each type of contract offered by the solicitor to prospective students and used by the solicitor's school, together with such advertising material and other representations as are made by the school to its students or prospective students, and such instructional material as may be requested by the State Superintendent to enable him to evaluate the

instructional program, as well as the sales methods of the school * * *." If the application is approved each solicitor must furnish a surety bond in the amount of $1,000 conditioned on the faithful performance of all agreements and contracts with students. The State Superintendent may revoke the permit issued to any solicitor for a violation of any student contract, or for other good cause. The regulatory provisions of the Maryland law are directly related to the evils sought to be curbed. We fail, however, to see more than a casual relationship to the same evils in the act under consideration.

Neither privately owned schools nor the collection of advance tuition are evils in themselves or harmful to the public. They seemingly are, however, the only subjects the act in question purports to curb or suppress. It is lawful to collect $25 advance tuition thereunder. By conforming to this single limitation any school may solicit students in South Dakota at will regardless of the character or quality of the institution, its faculty, facilities, or instruction. It may, with impunity thereunder, employ high pressure solicitors, offer bogus scholarships, give meaningless aptitude tests, guarantee placement of graduates, and exact exorbitant tuition fees. This statute, in effect, clothes a substandard school and its operations with apparent legality if it collects no more than $25 tuition in advance of actual attendance.

Protection is afforded only to the prospective student who, for any or no reason, changes his mind about going to a particular school after having agreed to do so. His loss is limited to $25. Otherwise, the statute offers absolutely no protection to the public against fraud and deceit. It requires no license and provides no sanctions against repeated offenses. There is no bar against the assignment of contract before a course of instruction is furnished. It establishes no standards and requires no inspections and furnishes no supervision. In short, there is a total absence of any means or method of controlling, regulating, or suppressing any asserted evil in the field of private education.

As a remedy against fraud, therefore, the challenged statute bears no reasonable relationship to the evils at which it is purportedly aimed. State v. Wood, 51 S.D. 485, 215 N.W. 487, 54 A.L.R. 719; City of Rapid City v. Schmitt, 75 S.D. 636, 71 N.W.2d 297; State v. Memorial Gardens Development Corp., 143 W.Va. 182, 101 S.E.2d 425, 68 A.L.R.2d 1233; Gambone v. Commonwealth, 375 Pa. 547, 101 A.2d 634; City and County of Denver v. Thrailkill, 125 Colo. 488, 244 P.2d 1074; Defiance Milk Co. v. Du Mond, 309 N.Y. 537, 132 N.E.2d 829; and State Board of Dry Cleaners v. Thrift-D-Lux Cleaners, 40 Cal.2d 436, 254 P.2d 29. The statute fails, in other words, to "contribute in some real and substantial measure to the object sought to be accomplished." City of Huron v. Munson, 67 S.D. 88, 289 N.W. 416.

We are of the further opinion that the limitation on advance tuition is an unreasonable, unnecessary, and unwarranted invasion of defendant's freedom of contract. In Grow System School v. Board of Regents, 277 App.Div. 122, 98 N.Y.S.2d 834, it was held that the cost of attending a private or parochial school was not a matter of sufficient public concern to justify its regulation by the state. The court said: "It may well be that the power to regulate certain phases of private school operation such as the nature of curriculum, the qualifications of teachers and the like, is a necessary and indispensable corrollary to the State's supervisory jurisdiction over education in general. In such fields general interest is obvious lest untrained and improperly prepared technicians be foisted upon an unsuspecting public. What that embryo technician, be he hair stylist or masseur, dentist or doctor, may have paid for his education is purely a personal matter between himself and the school of his choice, in which the public has no proper concern. If the State may fix the fees which a trade school may charge for its services, then it can do the same regarding every private school and for that matter every profession or calling where a license is required. Although we may feel that our feet are on the path leading to that point, we have not reached it yet. In the absence of any showing whatsoever that tuition in trade schools is a

matter of great public concern or affected with a public interest, any attempt on the part of the legislature to fix the rates thereof is an unnecessary and unwarranted interference with individual liberty, and hence unconstitutional." Similarly, the method or manner of paying for the cost of private education is primarily a matter of private concern and private contract.

Privately owned trade schools are filling an increasingly important educational need in this age of automation with its consequent and insatiable demand for trained and skilled workers. Such schools are not monopolistic in nature. Attendance is entirely voluntary. Their ownership or operation constitutes a useful, lawfull, private enterprise. In the absence of adequate reason then, the cost of attending private schools and their collection methods are not subject to control by the state. We fail to find any adequate reason for the offense of collecting advance tuition in excess of $25 by private schools. The collection of advance tuition is not inherently evil or harmful to the public unless accomplished by fraud, deception, or intent to injure. The failure of the act to so limit its application makes it an unwarranted and unjustifiable invasion of personal and private rights. Commonwealth v. Zasloff, 137 Pa.Super. 96, 8 A.2d 801. If the method and manner of paying tuition at a private school is subject to criminal penalty in the absence of intent to injure or in the absence of fraud, misrepresentation or other proper limitation for the indirect purpose of protecting the public against fraud in the solicitation of students, then the same indirect method of oppressive regulation may be extended to control and regulate the sale terms of any other useful and lawful commodity, product, or service. As the North Carolina Court so pungently pointed out, "fraud has been practiced on occasion in all relations of life since the serpent invaded Eden and misrepresented the qualities of the forbidden fruit to the woman." State v. Ballance, 229 N.C. 764, 51 S.E.2d 731, 7 A.L.R.2d 407.

■ As the limitation on the amount of advance tuition appears to be the heart and soul of the challenged

statute, we are convinced the legislature would not have enacted the other related and interdependent portions of the act without this inseparable restrictive proviso which we have concluded to be an unreasonable and unwarranted exercise of the police power. Consequently, as the statute does not contain a severability clause we deem it necessary to declare the entire act void.

Reversed.

ROBERTS and BIEGELMEIER, JJ., concur.

RENTTO, P.J., and SMITH, J., dissent.

RENTTO, P.J., (dissenting). Under its police power a state may suppress that which it deems a public evil. In this regard its power to regulate personal and property rights goes beyond the prevention of fraud or deceit, and includes all acts or things which affect the public health, safety or welfare. 16 C.J.S. Constitutional Law § 175; 11 Am.Jur., Constitutional Law, § 270. While the legislature need not select the best means possible, there must be a reasonable relationship between the evil with which it is concerned and the means availed of to minimize it. Mundell v. Graph, 62 S.D. 631, 256 N.W. 121; City of Sioux Falls v. Kadinger, 74 S.D. 217, 50 N.W.2d 797; Norwood v. Parenteau, 75 S.D. 303, 63 N.W.2d 807. Consequently, our review of such matters must be confined to the question of legislative power and not the wisdom of its action.

While the objects which those here supporting the law claim to have motivated its adoption are interesting they are beside the point. In State ex rel. Payne v. Reeves, 44 S.D. 568, 184 N.W. 993, this court said: "It is not for the court to inquire or determine whether a state of facts existed calling for the enactment of the legislation in question. That is for the exclusive consideration of the Legislature. If under any possible state of facts the act would be constitutional and valid, the court is bound to persume that such condition existed." As was written in Stavig v. Van Camp, 46 S.D. 472, 193 N.W. 731, "the constitutionality of a statute must be determined from those matters which

appear upon its face, and from those matters of which the court may take judicial notice."

As I read the act, so far as here pertinent, the legislature excluded from its operation schools with financial support from churches, religious or fraternal organizations, a state or one of its political subdivisions. With these beyond the operation of the law its proscriptions apply to schools like the one here involved which exist to make a profit and a few private schools which get outside financial support from sources other than those designated. Whether it could include in the same class schools of the second type is not here presented. City of Dell Rapids v. McShane, 37 S.D. 86, 156 N.W. 789; Torigian v. Saunders, 77 S.D. 610, 97 N.W.2d 586. Because defendant did not represent that kind of an institution he may not urge that their inclusion in a class with the others is improper.

I do not believe our legislature felt that the practices with which it was dealing were indulged in by schools supported by any government. If it had intended to exempt only schools supported by our governmental units it could have made that clear by using the phrase "this state" rather than "the state". Had such been its purpose there would have been no need to add the clause "or by any of its political subdivisions", because our subdivisions are without authority to operate schools except that our school districts provide the public elementary and secondary school system. In statutory construction literal interpretation must give way to legislative intent.

One of the most important decisions a person makes is choosing the training which is to prepare him for his future field of endeavor. If his choice puts him into an area not suited to his talents he is frustrated and the public welfare suffers. Ordinarily after such discovery he can, without too much loss, be directed into a field better suited to his abilities. However, this is much less likely if he has paid or obligated himself to pay a sum without limitation for the training he has chosen. From the act

it is apparent that the legislature wanted the prospective student freed of this handicap at least until he had been in contact with the chosen school or training. This, I think, is the evil which the legislature was interested in.

Schools such as the one here involved limit the training which they provide to a few fields, oftentimes only one, and generally they are vocational in nature. Their curriculums hold little hope for a misdirected student to escape his dilemma. Also they are in the business to make money for their owners, and human nature being what it is, there are always some who go beyond the bounds of propriety to be commercially successful. After all, financial gain is their reason for being.

These schools increased in number under the educational program of the G. I. Bill of Rights and with that discontinued competition among them for students increased. It seems to me that the legislature could reasonably conclude that under these circumstances credulous and uninformed persons had been sold an educational pig in a poke, only to discover after getting to the chosen school that it was not suitable or that their talents were in other fields of endeavor. For many of them it was then too late —they had purchased sight unseen.

Concerning the appropriateness of the means adopted to suppress the evil our inquiry is a narrow one. Regarding the police power this court in State v. Central Lumber Company, 24 S.D. 136, 123 N.W. 504, 42 L.R.A.,N.S., 804 said: "the legislative department of the state, within well-known and well-defined limitations, is the sole judge as to when and how that power is to be exercised." Its problem is a practical one, not legal. Along the same line this court in American Linseed Oil Company v. Wheaton, 25 S.D. 60, 125 N.W. 127, 41 L.R.A.,N.S., 149, wrote: "When a subject is within proper police power, it is for the Legislature to say what the remedy shall be." In State ex rel. Sharpe v. Smith, 58 S.D. 22, 234 N.W. 764 we find the principle stated thus: "if the field is a proper one for the exercise of the

police power, what the Legislature sees fit to do in that field in the nature of police regulation is very largely in its discretion." Adherence to this rule is necessary to make empty the charge that constitutional interpretation is a reflection of the social or economic theories of the judges.

Rules have been laid down for our guidance in determining whether the means adopted are unreasonable or arbitrary. In Norwood v. Parenteau, supra, appears this pronouncement, "debatable questions as to the reasonableness are not for the courts but for the Legislature, which is entitled to form its own judgment." To me this means that if different minds might differ as to the reasonableness of the means, the law must be upheld. "It is enough if it can be seen that in any degree, or under any reasonably conceivable circumstances, there is an actual relation between the means and the end." Stephenson v. Binford, 287 U.S. 251, 53 S.Ct. 181, 77 L.Ed. 288. This act clearly satisfies these requirements.

That many reputable schools not contributing to the evil with which the lawmakers were concerned would also be subject to the law may be unfortunate, but does not make it invalid. See Norwood v. Parenteau, supra. That case held reasonable a regulation which limited a newspaper advertisement by an optometrist to a maximum size of one column inch. The $25 limitation in this act is certainly no more vulnerable. In fact I think the legislature could properly have denied them the right to collect any amount in advance. It was for the legislature to say if and to what extent the harshness of the primitive doctrine of letting the "buyer beware" should be limited.

I am authorized to state that SMITH, J., joins in this dissent.