MC DONALD, Respondent v. SCH. BD. OF YANKTON IND. SCH. DIST. NO. 1 OF YANKTON, et al., Appellants

(246 N.W.2d 93)

(File No. 11550. Opinion filed July 9, 1976)

Rehearing Denied September 20, 1976

**John R. Kabeiseman, Brady, Kabeiseman, Light & Reade**, Yankton, for petitioner and relator, respondent.

**William P. Fuller** and **John E. Simko, Woods, Fuller, Shultz & Smith**, Sioux Falls, for respondents and appellants.

COLER, Justice.

The petitioner in this proceeding in mandamus, on behalf of his minor son and 152 other persons similarly situated, seeks to compel the appellant school board and members thereof to budget for and make available textbooks to students of a non-public school within the district pursuant to SDCL 13-34-16 and 13-34-16.1. The writ of mandamus was issued by the trial court which found the statutes to be constitutional under both the federal and state constitutions, and respondent has appealed. We reverse.

The appellants challenged both in the trial court and in this court the constitutionality of the statutes under the Establishment Clause of the First Amendment to the United States Constitution, which was made applicable to the states through the Fourteenth Amendment to the United States Constitution. Murdock v. Pennsylvania, 1943, 319 U.S. 105, 108, 63 S.Ct. 870, 87

L.Ed.2d 1292; Cantwell v. Connecticut, 1940, 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed.2d 1213.

They have further challenged the constitutionality thereof under the provisions of S.D. Constitution Article VI, § 3, and Article VIII, § 16.

The legislature, by amendment to SDCL 13-34-16 by Session Laws of 1973, Chapter 100, and Session Laws of 1974, Chapter 134, § 1, together with the provisions of SDCL 13-34-16.1 first enacted in 1973 by the same Chapter 100, and subsequently amended by Session Laws of 1974, Chapter 134, § 2, has clearly set forth its intent, in unambiguous terms, that school districts of this state are directed to loan books at their own cost to non-public school students as follows:

"13-34-16. All textbooks shall be loaned free to all public and nonpublic school students in grades one through twelve who are enrolled in schools which are supervised in accordance with chapter 13-4. The public school board in each district shall ascertain what textbooks are needed by such students in the district from time to time and shall order the same and shall furnish such books upon request.

"13-34-16.1. Textbooks loaned to children enrolled in a nonpublic school shall be textbooks which are approved by a public school board for use, whether actually used or not, in the particular public school district wherein such nonpublic school is located or in the particular public school district of which the nonpublic school student is a resident. Textbooks loaned by any public school district to nonpublic school students shall not exceed in value fifteen dollars per nonpublic school student in any single school year. Such values shall be determined by the public school district required to furnish the textbooks. The obligation provided herein as to nonpublic school students shall be the obligation of the public school district in which such nonpublic school student is a resident."

This court in Haas v. Ind. School Dist. No. 1 of Yankton, 1943, 69 S.D. 303, 9 N.W.2d 707, in construing the predecessor statute, SDC 15.1706, determined that the then existing statutory provision did not purport to make textbooks available to students of nonpublic schools and thus avoided the determination of the constitutional issue presented here. It is obvious from the legislative enactments and the history thereof that the legislature made no attempt to overcome that decision until well after the United States Supreme Court decision of Board of Education v. Allen, 392 U.S. 236, 88 S.Ct. 1923, 20 L.Ed.2d 1060, was handed down in 1968.

The latest amendments to SDCL 13-34-16 and 13-34-16.1 indicate a heavy reliance on the provisions of New York statutes[1]

---

1. In part, the then existing provisions of the New York Statute Education Law, § 701, as construed in Board of Education v. Allen, read as follows:

"1. In the several cities and school districts of the state, boards of education, trustees or such body or officer as perform the functions of such boards, shall designate text-books to be used in the schools under their charge.

"2. A text-book, for the purposes of this section shall mean a book which a pupil is required to use as a text for a semester or more in a particular class in the school he legally attends.

"3. In the several cities and school districts of the state, boards of education, trustees or such body or officers as perform the function of such boards shall have the power and duty to purchase and to loan upon individual request, to all children residing in such district who are enrolled in grades seven to twelve of a public or private school which complies with the compulsory education law, text-books. Text-books loaned to children enrolled in grades seven to twelve of said private schools shall be text-books which are designated for use in any public, elementary or secondary schools of the state or are approved by any boards of education, trustees or other school authorities. Such text-books are to be loaned free to such children subject to such rules and regulations as are or may be prescribed by the board of regents and such boards of education, trustees or other school authorities.

"4. No school district shall, during the school year nineteen hundred sixty-six — sixty-seven, the school year nineteen hundred sixty-seven — sixty-eight or the school year nineteen hundred sixty-eight — sixty-nine be required to purchase or otherwise acquire textbooks, pursuant to this section, the cost of which shall exceed an amount equal to fifteen dollars multiplied by the number of children residing in such district who on the first day of October of such school year are enrolled in grades seven through twelve of a public or private school which complies with the compulsory education law, or in any subsequent school year be required to purchase or otherwise acquire textbooks, the cost of which shall exceed an amount equal to ten dollars multiplied by the number of children residing in such district and so enrolled on the first day of October of such subsequent school year; and no school district shall be required to loan textbooks in excess of the textbooks owned or acquired by such district; provided, however that all textbooks owned or acquired by such district shall be loaned to children residing in the district and so enrolled in grades seven through twelve in public and private schools on an equitable basis.

"5. In the several cities and school districts of the state, boards of education,

which were upheld in Board of Education v. Allen, supra.

An analysis of South Dakota statutes relating to school text-books, SDCL 13-34, which has been significantly amended in recent years, leaves little language pertaining to that subject. While there are significant differences between the South Dakota statutes and those of New York, it would appear sufficient language was adopted by our legislature to accomplish the intended result if the statutes could be held constitutional. While the school district itself determines what textbooks it will use, with review preserved by the state board of education, SDCL 13-34-11, that section and the statutes under consideration herein are all that remain of a once detailed chapter dealing with text-books.

The trial court's memorandum decision and findings of fact do not reflect, nor does the record before us establish, whether the costs of textbooks are borne by the students or parents of students, or whether those costs are borne by the sectarian institution. The fact of the burden falling upon the parents was found present in both Board of Education v. Allen, supra, and in Meek v. Pittenger, 1975, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217. Both of these cases, in keeping with earlier decisions of that court, see Cochran v. Louisiana State Board of Education, 1930, 281 U.S. 370, 50 S.Ct. 335, 74 L.Ed. 913, have acknowledged that loans of state-owned textbooks to students of sectarian schools constitutes permissible involvement of church and state under the Establishment Clause of the Federal Constitution, provided the tests therein established have been met by state statute.

■ We do not determine whether the lack of a finding that the parents bear the cost of textbooks or, as also alleged by the appellants, the lack of the legislative policy statement[2] renders

---

trustees or other school authorities may purchase supplies and either rent, sell or loan the same to the pupils attending the public schools in such cities and school districts upon such terms and under such rules and regulations as may be prescribed by such boards of education, trustees or other school authorities."

2. The appellants have challenged the statutes in question in that, while they are patterned after the statutes of New York, there was no policy statement accompanying, as was done in New York.
 By way of example, the provisions of Section 1 of Chapter 320 of the Laws of

the provisions of our law void under the tests established in Board of Education v. Allen, supra, and Meek v. Pittenger, supra, as we determine the provisions of our own state constitution are controlling.

■ Mindful of the decisions of this court which have considered the provisions of S.D.Const. Art. VI, § 3 and Art. VIII, § 16, namely Synod of Dakota v. State, 1891, 2 S.D. 366, 50 N.W. 632; Hlebanja v. Brewe, 1931, 58 S.D. 351, 236 N.W. 296; Haas v. Independent School Dist. No. 1 of Yankton, supra, and South Dakota High School Inter-Scholastic Activities Association v. St. Mary's Inter-Parochial School of Salem, 1966, 82 S.D. 84, 141 N.W.2d 477, we have nevertheless considered in depth recent decisions of courts of other states, as well as the differing constitutional provisions of those states, in which there has been activity in the way of either constitutional amendments or statutes, or both, to accomplish some acceptable mode of giving aid to nonpublic schools. We do not doubt the motives of the legislature of this state in attempting to do equity, considering the pressing and ever-increasing financial demands on both the public and private schools and the burden it places on taxpayers, with a dual burden on parents of children in the nonpublic schools. We are

New York 1965, reads as follows:

"Section 1. Statement of policy. The security and welfare of the nation require the fullest development of the mental resources and skills of its youth. This calls for more adequate educational opportunities and increased efforts to educate more of the talent of our nation and requiring the correction of those imbalances in our educational programs which have led to an insufficient proportion of our population educated in the fields of science, mathematics, foreign languages and other nonsectarian subjects. The Congress of the United States has reaffirmed the principle that the states and local communities retain primary responsibility for public education. It is hereby declared to be the public policy of the state that the public welfare and safety require that the state and local communities give assistance to educational programs which are important to our national defense and the general welfare of the state."

The failure of the legislative enactment to set forth a statement of policy we do not consider as significant since it is a practice not generally followed in this state. It is the accepted rule of statutory construction in this state that the act itself must reflect the legislative intent and while preambles or recitals are entitled to great weight, they are not binding on this court. Clem v. City of Yankton, 1968, 83 S.D. 386, 160 N.W.2d 125. A preamble may be looked to to resolve ambiguities as was recognized by this court in Culhane v. Equitable Life Assur. Soc. of U.S., 1937, 65 S.D. 337, 274 N.W. 315. Cf. also 82 C.J.S. Statutes § 349; 1A Sutherland on Statutory Construction, 4th Ed., § 20.13.

As we have stated in the opinion the statute is unambiguous and therefore such a policy statement is unnecessary for the purpose of construction.

not, however, concerned with the wisdom of the legislation, State v. Nuss, 1962, 79 S.D. 522, 114 N.W.2d 633, but only with its constitutionality.

 It has long been the rule of this court that:

"When considering the constitutionality of any statute there is a presumption of validity and no statute should be held unconstitutional 'unless its infringement of constitutional restrictions is so plain and palpable to admit of no reasonable doubt', *State v. Black Hills Transportation*, 71 S.D. 28, 20 N.W.2d 683." In re Hinesley, 1967, 82 S.D. 552, 150 N.W.2d 834.

Furthermore, as it concerns the power of the legislature, this court has long recognized that:

"The constitution is not a grant but a limitation upon the lawmaking power of the state legislature and it may enact any law not expressly or inferentially prohibited by state and federal constitutions." Kramar v. Bon Homme County, 1968, 83 S.D. 112, 155 N.W.2d 777.

 We have diligently reviewed the history of our constitutional provisions [3] and compared them with other states and have

---

3. Because of this court's well established rule that a statute is presumed constitutional, we have rigorously researched available history of the 1883, 1885 and 1889 constitutional conventions to determine if the framers of our constitution, by the language of S.D.Const. Art. VI, § 3, Art. VIII, § 16, intended to establish provisions which are either more restrictive than, or equally restrictive to, the restrictions imposed by the First Amendment to the United States Constitution. Respective counsel for both parties have presented commendable briefs that reflect, however, what our research confirms, that there is no history, nor is there any indication of constitutional provisions of any other state having been utilized, to show prior origin which would indicate that the framers of our constitution relied on anything other than their own concepts and that they obviously were not parroting the Establishment Clause of the United States Constitution. A close comparison of the provisions of Article VI, § 3 with its predecessors, Article II, §§ 2 and 3 of the Constitution of 1883 and Article VI, § 3 of the 1889 Constitution and Article VIII, § 16 with Article VII, § 9 of the 1883 constitutional proposal which became Article VIII, § 16 of the 1889 Constitution fails to disclose that any material changes were made in the subject matter of these two constitutional provisions that might signify that the members of the constitutional convention of 1889 felt any compulsion to conform this state's constitution to the Establishment Clause of the United States Constitution which they could well have done under the first and fourth para-

also analyzed recent opinions of other state courts on the identical subject. To a large extent we have gone through the same exercise as has the Nebraska Supreme Court as reflected in Gaffney v. State Department of Education, 1974, 192 Neb. 358, 220 N.W.2d 550. Although the history behind the provisions of Art. VII, § 11, of the Constitution of Nebraska has been preserved as set forth at 220 N.W.2d 553, we are not so fortunate. As reflected in the editor's notes, certain portions of the manuscript covering S.D.Const. Art. III, §§ 2, 3, 4 and 5 were not available for publication as authorized by S.L.1907, Ch. 98 (see S.D. Constitutional Debates, Vol. I, p. 281). Considering the very active participation in the 1883, 1885 and 1889 constitutional conventions by one Alphonso G. Kellam of Brule County, who also served as one of the three members of this court from 1889 to 1896, the likelihood of misapprehension of the purpose to be served by the state constitutional provisions by either the same A. G. Kellam, the then presiding judge of this court, or either of the other two members of the court is too remote to be seriously entertained. Therefore, we must recognize that the holding of this court in Synod of Dakota v. State, supra, to the effect that the provisions of Art. VI, § 3 and Art. VIII, § 16 are "self-executing," and that these provisions are expressions of the framers of the constitution "to prohibit in every form, whether as a gift or otherwise, the appropriation of the public funds for the benefit of or to aid any sectarian school or institution." 2 S.D. at 373-374, 50 N.W. at 635.[4] Those

graphs of this state's compact with the United States as reflected in S.D.Const. Art. XXII. Certainly the Omnibus Bill (25 Statutes at Large 676, SDCL Vol. 1 pp. 183 et seq.) which created and prescribed the powers of the 1889 conventions, so often recognized as a limitation on the convention's deliberations (see South Dakota Debates 1889 pp. 70-76, 101, 102, 316, 319, 324, 334-366, 401-403, 429-445, 449), neither required retention of the preexisting provisions nor denied their modification had the convention so elected. There is therefore no evidence to offset this court's prior decision as to intent of the framers as defined in Synod of Dakota v. State, supra, and while it may have been unnecessary to the decision in Hlebanja v. Brewe, 1931, 58 S.D. 351; 236 N.W. 296, the statement therein to the effect that Synod of Dakota v. State, supra, left little if any constitutional question undetermined is still a most appropriate statement.

4. While it is true, as noted in the dissent of Chief Justice Dunn, that this court, in Synod of Dakota v. State, 1891, 2 S.D. 366, 50 N.W. 632, had under consideration Chapter 1, Laws of 1890, which established a system for direct payment to sectarian schools for training teachers, it is significant that the 1890 act was declared unconstitutional on the basis of our state Constitution and not under the Establishment Clause of the United States Constitution. Cf. Roemer et al. v. Board of Public Works of Maryland et al., 1976, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179.

provisions of our constitution though not identical to any other state constitution are not mere reiterations of the Establishment Clause of the United States Constitution but are more restrictive as prohibiting aid "in every form."

Respondents further claim that Synod of Dakota v. State, supra, is distinguishable from the present case in that that case dealt with payment of funds to a sectarian institution, while the statutes here involved only authorize a loan of textbooks. We construe Synod of Dakota v. State, supra, as consistent with the holding of the Nebraska Supreme Court on construing a similar constitutional provision that such a contention of indirect benefit "ignores substance for form, reality for rhetoric, and would lead to total circumvention of the principles of our Constitution * * * ." Gaffney v. State Department of Education, supra, 220 N.W.2d at 556.

■ The respondents have also urged this court to affirm the judgment of the trial court on the basis that school districts, not being specifically enumerated in Art. VIII, § 16, are not thereby barred from giving or appropriating money or property to a sectarian or religious society or institution. We find this contention to be without merit as it ignores the basic fact of the numerous state funds channeled to school districts with no separate identifiable local fund set aside to purchase the required textbooks (see SDCL 13-34-12, repealed by S.L.1974, Ch. 133, § 2) thus violating the provisions of S.D.Const. Art. VI, § 3. Even if the funds were so identifiable as to avoid the use of state funds, and though perhaps not controlling, this court, in construing other provisions of this state's constitution has held that the words "municipal corporations" in their ordinarily accepted and more enlarged sense of public local corporations may include "school district." Egan Con. Sch. Dist. v. Minnehaha Co., 1936, 65 S.D. 32, 270 N.W. 527. Cf. Town of Dell Rapids v. Irving, 1895, 7 S.D. 310, 64 N.W. 149; Sanders v. Sch. Dist. of Sioux Falls, 1915, 35 S.D. 48, 150 N.W. 473.

■ Appellants have assigned as error an implied finding of the trial court that it had jurisdiction under the provisions of SDCL 21-29 to proceed in mandamus where there was an ade-

quate remedy at law, namely an appeal pursuant to SDCL 13-46-1. Prior decisions of this court, construing statutes enacted under the then existing provisions of S.D.Const. Art. V, § 14, which is not unlike the current provisions of Art. V, § 5, have approved the denial of a writ. But, this court has also acknowledged in C., M., St. P. & P. R. Co. v. R. R. Commrs., 1936, 64 S.D. 297, 266 N.W. 660, that the power, authority and jurisdiction of circuit courts to issue remedial writs and hear and determine the same cannot be impaired, diminished or destroyed by the legislature. Because of the public nature of these questions raised in this appeal, the trial court may well have determined that on appeal from the school board decision even through a trial de novo in circuit court pursuant to SDCL 13-46-6, which also contemplates mandamus as a means of enforcement, a meaningful record could not have been developed for a final determination of the issues presented. We find no abuse of the trial court's discretion in entertaining this proceeding.

■ We therefore hold that the provision of SDCL 13-34-16.1 is unconstitutional and, to the extent that SDCL 13-34-16 provides for the loan of textbooks to private school students, it is likewise unconstitutional under the provisions of S.D.Const. Art. VI, § 3, and Art. VIII, § 16.

Accordingly, the judgment and order granting the peremptory writ of mandamus are reversed, with direction to quash the writ and dismiss these proceedings.

No costs shall be taxed as a public question is involved. McFarland v. Barron, 1969, 83 S.D. 639, 164 N.W.2d 607.

WINANS and WOLLMAN, JJ., concur.

DUNN, C. J., dissents.

DUNN, Chief Justice (dissenting).

The majority opinion holds SDCL 13-34-16 and 13-34-16.1 unconstitutional under the provisions of Article VI, § 3, and Article VIII, § 16, of the South Dakota Constitution. It does not reach the

question of whether the two statutes violate the Establishment Clause of the First Amendment to the United States Constitution. I think a review of what the United States Supreme Court has said in this area is important, not only to determine if the loaning of texbooks to nonpublic school children by the state violates the United States Constitution but also as to whether it violates our own Constitution.

The issue of loans of textbooks to nonpublic school children first reached the United States Supreme Court in the 1930 case of Cochran v. Louisiana State Board of Education, 281 U.S. 370, 50 S.Ct. 335, 74 L.Ed. 913. The specific question there was whether a Louisiana law providing free books to nonpublic school children was a taking of public property for private purposes in violation of the Fourteenth Amendment. The reason the Establishment Clause of the First Amendment was not considered was that the Court had not yet applied that particular clause to the states through the Fourteenth Amendment. The Supreme Court upheld the textbook law and in doing so quoted the language of the Louisiana Supreme Court in its opinion as follows:

> " 'The appropriations were made for the specific purpose of purchasing school books for the use of the school children of the state, free of cost to them. It was for their benefit and the resulting benefit to the state that the appropriations were made. True, these children attend some school, public or private, the latter, sectarian or nonsectarian, and that the books are to be furnished them for their use, free of cost, whichever they attend. *The schools, however, are not the beneficiaries of these appropriations. They obtain nothing from them, nor are they relieved of a single obligation because of them. The school children and the state alone are the beneficiaries.*' " (Emphasis supplied) 281 U.S. at 374-375, 50 S.Ct. at 335, 74 L.Ed. at 915.

This "child benefit" theory was subsequently used by the Supreme Court when it was faced with a challenge to public expenditures to parochial school children and their parents based upon the First Amendment's Establishment Clause. In Everson

v. Board of Education, 1946, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711, the challenge was to a New Jersey law which authorized school districts to reimburse parents of parochial school children the cost of transporting the children to school on public transportation. The Supreme Court, through Mr. Justice Black, held that the law did not violate the Establishment Clause, as the benefit of the law went to the school children and their parents, rather than to any religious sect or the parochial schools. The Court concluded the opinion by saying:

> "The State contributes no money to the schools. It does not support them. Its legislation, as applied, does no more than provide a general program to help parents get their children, regardless of their religion, safely and expeditiously to and from accredited schools." 330 U.S. at 18, 67 S.Ct. at 513, 91 L.Ed. at 725.

In 1968 the Supreme Court applied the "child benefit" theory to a New York law which required school districts to purchase and loan textbooks to students enrolled in parochial as well as in public and private schools. The issue was whether the law violated the mandates of the Establishment Clause. The Court held that it did not, placing prime reliance on the fact that the books went directly to the students and did not directly benefit or aid the parochial schools.

> "Appellants have shown us nothing about the necessary effects of the statute that is contrary to its stated purpose. The law merely makes available to all children the benefits of a general program to lend school books free of charge. Books are furnished at the request of the pupil and ownership remains, at least technically, in the State. Thus no funds or books are furnished to parochial schools, and the financial benefit is to parents and children, not to schools. Perhaps free books make it more likely that some children choose to attend a sectarian school, but that was true of the state-paid bus fares in *Everson* and does not alone demonstrate an unconstitutional degree of support for a religious institution." Board of Education v. Allen, 392 U.S. 236 at

243-244, 88 S.Ct. 1923 at 1926-1927, 20 L.Ed.2d 1060 at 1065-1066.

The Allen case is still good law. In more recent years the Supreme Court has added other tests. These were summarized in the case of Meek v. Pittenger, 1975, 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217.

> "First, the statute must have a secular legislative purpose. E.g. *Epperson v. Arkansas*, 393 U.S. 97, 89 S.Ct. 266, 21 L.Ed.2d 228. Second, it must have a 'primary effect' that neither advances nor inhibits religion. E.g. *School District of Abington Township v. Schempp*, 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844. Third, the statute and its administration must avoid excessive government entanglement with religion. E.g. *Walz v. Tax Comm'n*, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697." 421 U.S. at 358, 95 S.Ct. at 1760, 44 L.Ed.2d at 227-228.

In Meek the Court applied the above tests to the textbook loan provisions of a Pennsylvania law. While it struck down other provisions of the law in the face of the Establishment Clause, the Court upheld loans of textbooks to parochial school children. The Court stressed that the benefits accrued to the children rather than to the schools.

> "In sum, the textbook loan provisions of Act 195 are in every material respect identical to the loan program approved in *Allen*. Pennsylvania, like New York, 'merely makes available to all children the benefits of a general program to lend school books free of charge.' As such, those provisions of Act 195 do not offend the constitutional prohibition against laws 'respecting an establishment of religion.' " 421 U.S. at 362, 95 S.Ct. at 1761-1762, 44 L.Ed.2d at 230.

Based upon the holdings of the Supreme Court in Allen and Meek, SDCL 13-34-16 and 13-34-16.1 comport with the Establishment Clause of the First Amendment to the United States Constitu-

tion. These two cases have been cited with approval in the very recent United States Supreme Court case of Roemer v. Board of Public Works of Maryland, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179, decided June 21, 1976.

The majority opinion states that the provisions of the South Dakota Constitution are more restrictive than the Establishment Clause. I do not feel that a lengthy discussion of whether the South Dakota provisions are more restrictive than the provisions of the Establishment Clause or the Pennsylvania Constitution or the Nebraska Constitution will in any way help resolve the overall question of the validity of the challenged provisions under the South Dakota Constitution. Any inquiry should be directed first to the words of the constitutional sections involved.

Article VI, § 3, states in pertinent part:

"No person shall be compelled to attend or support any ministry or place of worship against his consent nor shall any preference be given by law to any religious establishment or mode of worship. No money or property of the state shall be given or appropriated for the benefit of any sectarian or religious society or institution."

Article VIII, § 16, states:

"No appropriation of lands, money or other property or credits to aid any sectarian school shall ever be made by the state, or any county or municipality within the state, nor shall the state or any county or municipality within the state accept any grant, conveyance, gift or bequest of lands, money or other property to be used for sectarian purposes, and no sectarian instruction shall be allowed in any school or institution aided or supported by the state."

It is my feeling that this case revolves around the key words "benefit of any sectarian or religious society or institution" and "aid any sectarian school" in the above quoted sections. While the

wording of these sections varies greatly from the simple words of the Establishment Clause, the meaning is the same; state expenditures which aid and benefit religious societies or schools are prohibited. Thus the inquiry should be the same under our own Constitution as that used by the Supreme Court with the Establishment Clause: Who reaps the benefits of the challenged legislation, the schools or the school children? In Cochran, Allen and Meek, supra, the Supreme Court has said explicitly that when the state loans school textbooks to parochial school children, the benefit accrues to the children and the state rather than to any sectarian institution. Article VI, § 3, and Article VIII, § 16, of our Constitution clearly state that the expenditures must not benefit and aid a religious society or institution. Since SDCL 13-34-16 and 13-34-16.1 do not directly benefit these institutions, they should be upheld by this court.

The majority opinion does not distinguish this court's holding in Synod of Dakota v. State, 1891, 2 S.D. 366, 50 N.W. 632, from the present case. It states that to attempt to distinguish the cases would somehow circumvent the principles of our Constitution. I disagree. I feel that in failing to set out the factual and legal differences the opinion not only circumvents the principles of our Constitution but also ignores the plain words of the relevant constitutional sections. The case of Synod of Dakota v. State, supra, involved payments by the State to Pierre University, a Presbyterian College, for student tuition. Unlike the instant case, money was paid directly to a sectarian institution for the benefit of that institution in its operations. Here we have books loaned to school children for the benefit of their respective secular education and ultimately for the benefit of the state. In short, Synod cannot be considered as precedent for declaring the challenged statutes unconstitutional. The difference in the facts of the two cases is to me the difference between an unconstitutional appropriation of money to sectarian colleges and a constitutional loan of books to children who happen to attend nonpublic schools.

A quality education is one of the most important gifts that our children can receive. The legislature, in its collective wisdom, has sought to insure a quality education for all the children of the state by loaning secular textbooks to them free of charge. It

fulfills a further purpose in insuring that all schools, public or sectarian, abide by a course of study which is set up by the state for its school children. The use of the same textbooks would serve to carry out this course of study for all students. I have not changed my mind on the question of state aid to a sectarian institution for the benefit of that institution or its operations. This should not be tolerated, but I do not believe that some children should be deprived of these books simply because they happen to attend sectarian schools, nor do I feel that our federal or state Constitution so mandates. The judgment and order of the circuit court should be affirmed.